FILED
United States Court of Appeals
Tenth Circuit

June 29, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KIZZY KALU,

      Defendant - Appellant.

No. 14-1068

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:12-CR-00106-MSK-1)**

Robert T. Fishman, Ridley, McGreevy & Winocur, PC, Denver, Colorado, appearing for Appellant.

James C. Murphy, Assistant United States Attorney (John F. Walsh, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Appellee.

Before **MATHESON, BACHARACH,** and **MORITZ,** Circuit Judges.

**MATHESON**, Circuit Judge.

Kizzy Kalu recruited foreign nationals to come to the United States for specialized nursing employment, required them to work as non-specialized laborers in nursing homes, retained a portion of their wages for personal profit, and threatened them with deportation and financial ruin if they did not comply with his demands. As part of the scheme, he misrepresented the terms of their employment to the government to obtain visas and bring the foreign nationals into the country.

The government determined Mr. Kalu's enterprise was fraudulent and charged him in a 95-count superseding indictment. After a trial, a jury found Mr. Kalu guilty of 89 of the counts alleged, including (1) mail fraud under 18 U.S.C. § 1341 and 18 U.S.C. § 2; (2) encouraging and inducing an alien under 8 U.S.C. § 1324(a)(1)(A)(iv), (a)(1)(B)(i), and 18 U.S.C. § 2; (3) visa fraud under 18 U.S.C. § 1546 and 18 U.S.C. § 2; (4) forced labor under 18 U.S.C. § 1589 and 18 U.S.C. § 2; (5) trafficking in forced labor under 18 U.S.C. § 1590 and 18 U.S.C. § 2; and (6) money laundering under 18 U.S.C. § 1956 and 18 U.S.C. § 2. The district court sentenced Mr. Kalu to 130 months of imprisonment on some counts and 120 months on others, with the sentences running concurrently. The court also ordered forfeiture in the amount of $475,592.94 and awarded $3,790,338.55 in restitution.

Mr. Kalu argues the district court erroneously instructed the jury on various offenses and seeks reversal of his convictions. He also contends the district court abused its discretion in calculating restitution. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm the district court.

## I.  BACKGROUND

### A.  *Factual History*

H-1B visas are temporary worker visas for those who work in a "specialty occupation."  8 C.F.R. § 214.2(h)(1)(ii)(B).  The visa grants a "nonimmigrant alien" admission to the United States for an initial tenure of up to three years.  *Id.* § 214.2(h)(9)(iii)(A)(1).  The application process requires the employer to attest to a number of employment conditions in a Labor Condition Application ("LCA")—including that the employee will be working in a specialized position, performing particular job duties, and earning above a certain threshold for the location where the position is located—and then file a form ("I-129") with the Department of Homeland Security to petition for an H-1B visa.  The employer must notify the government if the underlying conditions of employment change.  *Id.* § 214.2(h)(2)(i)(E).  H-1B visas are employer specific; if the foreign national ceases to work for the sponsoring employer, the government must be notified and the visa may be cancelled or, under some conditions, transferred to a different employer.  *Id.* § 214.2(h)(2)(i)(D).

Mr. Kalu recruited nurses from abroad, charging them a fee—typically $6,500—to procure H-1B visas to allow them to enter the United States.[1]  He oversaw the submission

---

[1] The sponsoring employer is legally required to pay the H-1B petition fee.  If the foreign nationals initially pay the fee, the employer must reimburse them.  At trial, the foreign nationals in this case testified that Mr. Kalu did not reimburse them for their visa fees.

of 41 H-1B visa petitions, primarily for foreign nationals from the Philippines, which indicated they would work for Adam University ("AU") as "nurse instructor/supervisors."[2] The federal government grants 65,000 H-1B visas per year, but educational institutions are exempt from the H-1B visa cap.

When they arrived in the United States, the foreign nationals did not work for AU. Instead, Mr. Kalu's for-profit corporation, Advanced Training and Education for Foreign Healthcare Professionals Group, LLC ("FHPG"), placed the foreign nationals as employees in nursing homes in Colorado.[3] Although the foreign nationals were admitted as employees of AU, Mr. Kalu did not update the government and continued to file visa petitions after October 1, 2008, when AU no longer had a physical presence in Colorado and had ceased to exist in any meaningful fashion. He continued to represent to the nurses, his attorney, and immigration officials that AU was functioning and recruiting foreign nationals for employee positions.

---

[2] Some of the foreign nationals were promised employment as a "clinical nurse practitioner."

[3] In some visa petitions, Mr. Kalu listed FHPG as the sponsoring employer. When the federal government questioned whether FHPG was a non-profit organization and not subject to the H-1B visa cap, Mr. Kalu represented that FHPG was affiliated with AU, a degree-granting entity which contracted to use the facilities of Teikyo Loretto Heights University. Mr. Kalu indicated that a portion of FHPG's work would "directly benefit" AU. Mr. Kalu then informed his attorney that AU would be employing the foreign nationals directly, and subsequent petitions listed AU as their employer.

Upon arriving in the United States, the foreign nationals discovered they would be working as unspecialized laborers in nursing homes and not as instructors or supervisors as indicated on their visa petitions. Mr. Kalu arranged for the nurses to work in particular nursing homes and orchestrated their remuneration. The nursing homes typically paid FHPG $35/hour for the nurses' labor, and FHPG would pay $20/hour of that rate to the nurses themselves. Mr. Kalu eventually told many of the nurses they would have to find their own nursing jobs with non-FHPG-affiliated facilities. He informed the nurses that, because they would be paid for these non-FHPG jobs by the nursing homes directly, they would be required to pay him over a thousand dollars per month, whether or not they were working. If the nurses did not pay him, Mr. Kalu threatened to report them, have their visas revoked, have them deported, or enforce a $25,000 penalty for breaching their contract.

Mr. Kalu's scheme relied on a number of fraudulent misrepresentations that allowed him to bring the nurses to the United States, keep them in the country, and profit from their labor. The H-1B visa applications falsely indicated the foreign nationals would be AU employees, when they were in fact required to sign separate employment contracts with Mr. Kalu's company and were outsourced to nursing homes.[4] The applications also indicated the foreign nationals would be nurse instructors/supervisors

_____

[4] Mr. Kalu instructed the foreign nationals not to bring these separate employment contracts to their interviews at the embassy, informing them that if the embassy saw them, the visa would be denied.

and thus engaged in a "specialty occupation"—a requirement for an H-1B visa—when they in fact did not have any meaningful instruction or supervision responsibilities and would be ordinary nurses in nursing homes.[5]  The applications further referenced job offers from AU falsely representing that the foreign nationals would be earning $72,000 per year, which would satisfy the requirement that they be paid at or above the prevailing wage for Denver, when none of them actually earned that amount.  Most were paid $20/hour, and many worked outside of Denver.[6]  The applications did not indicate Mr. Kalu would be retaining a sizable portion of their wages for his personal gain.  The government argued 14 foreign nationals provided labor, at least in part, because Mr. Kalu held them in debt for various costs and informed them that if they did not work in a nursing home he would be required to report them to the government and they could face deportation.

---

[5] The relevant statute and implementing regulations define "specialty occupation" as "an occupation that requires (A) theoretical and practical application of a body of highly specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States."  8 U.S.C. § 1184(i)(1); *see* 8 C.F.R. § 214.2(h)(4)(i)(A).

[6] Mr. Kalu argues the nurses could have made $72,000 per year, but this would have required them to work approximately 65 hours per week.  Even if overtime would have enabled them to make $72,000, this argument does not satisfy the legal criteria for an H-1B visa.  The salary promised to H-1B visa workers must be "a base salary, a set salary, a guaranteed salary that the employer intends to pay the foreign national."  ROA, Vol. 4 at 737-38.  Furthermore, trial testimony established some employees could not find more than 40 hours of work a week.

## B. *Procedural History*

On March 1, 2012, Mr. Kalu and Philip Langerman, the president and founder of AU, were named in a 132-count indictment. On February 12, 2013, a superseding indictment charged Mr. Kalu with: (1) Counts 1-22 of commercial carrier/mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; (2) Counts 23-37 of encouraging and inducing an alien in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), (a)(1)(B)(i) and 18 U.S.C. § 2;[7] (3) Counts 38-40 of visa fraud in violation of 18 U.S.C. § 1546 and 18 U.S.C. § 2;[8] (4) Counts 41-54 of forced labor in violation of 18 U.S.C. § 1589 and 18 U.S.C. § 2; (5) Counts 55-64 of trafficking in forced labor in violation of 18 U.S.C. § 1590 and 18 U.S.C. § 2 and (6) Counts 65-95 of money laundering in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 2.[9]

Mr. Kalu pled not guilty. He argued he was a middleman tasked with arranging visas and it was AU's obligation to ensure the foreign nationals were working as nursing instructors/supervisors. He contended only AU indicated the nurses would earn $72,000 annually, while FHPG's website and Mr. Kalu's own communications with the nurses indicated they would be paid $20/hour. He also argued he acted in good faith in

---

[7] The government alleged Mr. Kalu had encouraged or induced 15 nonimmigrant workers to illegally enter and reside in the United States.

[8] The government charged these counts based on the three I-129 petitions Mr. Kalu personally signed.

[9] The superseding indictment also included forfeiture allegations under 21 U.S.C. § 853(p).

accordance with advice he received from Denise Perez, the attorney who reviewed the H-1B petitions. After a 15-day trial and three days of deliberation, a jury found Mr. Kalu guilty of the charges in Counts 1-18, 22-49, 51-59, 61-67, and 69-95, for a total of 89 of the 95 counts alleged.

At sentencing, the district court determined Mr. Kalu's total offense level was 38 and his criminal history category was 1. The presentence report ("PSR") calculated the United States Sentencing Guidelines ("Guidelines") range as 235 to 293 months of incarceration. The PSR observed the Guidelines range exceeded the statutory maximum of 240 months for Counts 1-18, 22, 41-49, 51-59, 61-67, and 69-95 and 120 months for Counts 23-40. Based on these calculations, the district court noted the applicable range would be 235 to 240 months for Counts 1-18, 22, 41-49, 51-59, 61-67, and 69-95 and 120 months for Counts 23-40. The court rejected the Government's request for a 300-month sentence, explaining that Mr. Kalu's crimes were largely economic, distinguishing them from forced-labor cases involving physical brutality or isolation. After considering the circumstances of the offense, the court opted to use a total offense level of 32, which yielded a guideline range of 121 to 151 months of incarceration. It sentenced Mr. Kalu to 130 months of imprisonment on Counts 1-18, 22, 41-49, 51-59, 61-67, 69-95, and 120 months for Counts 23-40, with the sentences on all counts running concurrently. The court ordered Mr. Kalu to pay $475,592.94 in forfeiture and $3,790,338.55 in restitution to compensate the nurses for their losses.

Mr. Kalu subsequently appealed his convictions and the restitution ordered by the court.

## II. **DISCUSSION**

On appeal, Mr. Kalu argues the district court erroneously instructed the jury regarding the charged offenses and incorrectly calculated the restitution award. We review each of the disputed jury instructions and conclude Mr. Kalu's claims do not survive plain error review. We also determine the district court properly calculated the restitution owed to the foreign nationals.

### A. *Jury Instructions*

Mr. Kalu contends four jury instructions misstated or altered offenses charged in the superseding indictment. To determine whether the district court erred, "[w]e review the jury instructions de novo and 'view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.'" *United States v. Thomas*, 749 F.3d 1302, 1312 (10th Cir. 2014) (quoting *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008)). "In doing so, we consider whether the district court abused its discretion in 'shaping or phrasing . . . a particular jury instruction' and deciding to give or refuse a particular instruction." *Id.* at 1312-13 (alteration in original) (quoting *Bedford*, 536 F.3d at 1152). "Ordinarily, failure to instruct on such an essential element as intent or knowledge requires reversal." *United States v. Prince*, 647 F.3d 1257, 1265 (10th Cir. 2011) (quotations and alterations omitted).

Mr. Kalu claims one of these jury instructions constructively amended the indictment. To determine whether the district court erred on that ground, "[w]e review de novo whether the jury instructions constructively amended the indictment. . . . To constitute a constructive amendment, the district court proceedings must modify an essential element of the offense or raise the possibility the defendant was convicted of an offense other than that charged in the indictment." *United States v. DeChristopher*, 695 F.3d 1082, 1095 (10th Cir. 2012) (quotations and citations omitted). "A variance that expands the [i]ndictment is considered a constructive amendment and is per se reversible error." *United States v. Davis*, 55 F.3d 517, 521 (10th Cir. 1995). "A variance that does not rise to the level of a constructive amendment does not require reversal." *Id.*

In this case, our review goes beyond considering error because Mr. Kalu acknowledges he did not raise these challenges before the district court and presents them for the first time on appeal. When a party fails to object to an instruction at trial, we review for plain error, which "exists only where (1) there was error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Bedford*, 536 F.3d at 1153 (quotations omitted); *see* Fed. R. Crim. P. 52(b); *United States v. Brown*, 400 F.3d 1242, 1253 & n.6 (10th Cir. 2005) (applying this standard to constructive amendments not raised at trial). To survive plain error review, the error must be so serious it "affects the defendant's fundamental right to a fair and impartial trial." *United States v. Uresti-Hernandez*, 968 F.2d 1042, 1046 (10th Cir. 1992) (quotations omitted). Mr. Kalu bears the burden of demonstrating

the existence of plain error warranting relief.  *United States v. Balderama-Iribe*, 490 F.3d 1199, 1204 (10th Cir. 2007).

## 1. **Specific Intent to Defraud (Instruction 17)**

Counts 1-22 of the superseding indictment charged Mr. Kalu with mail fraud.[10] Mr. Kalu argues the district court plainly erred by failing to instruct the jury that specific intent to defraud is an element of mail fraud under 18 U.S.C. § 1341.  The statute states in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier . . . shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

The superseding indictment charged Mr. Kalu under this statute, alleging he "devised and intended to devise a scheme to obtain money by means of false and fraudulent pretenses and representations," and as part of this scheme, "made false and fraudulent representations to foreign nationals, the State of Colorado, the government of the United States, and others in order to obtain money, and aided and abetted the same."

---

[10] Mr. Kalu was also charged with aiding and abetting mail fraud under 18 U.S.C. § 2.

ROA, Vol. 1 at 92.  In support of the charge, it detailed a number of specific

representations and acts Mr. Kalu made to advance his scheme.

The jury instructions for Counts 1-22, however, did not contain the element of

intent to defraud.  Instruction 17, the elemental jury instruction pertaining to § 1341,

stated:

> [t]o prove each of Counts 1-22, the Government must establish, beyond a
> reasonable doubt, all of the following four elements:
> 1.  That Mr. Kalu knowingly participated in a scheme or plan to obtain
> money or property from another person through false representations, as
> that scheme is described in the Superseding Indictment;
> 2.  That Mr. Kalu knew that the representations that were being made as
> part of the scheme were false;
> 3.  That the false representations were material; and
> 4.  That Mr. Kalu knew or could have reasonably anticipated that a person
> would use the mails or an interstate private or commercial carrier to
> transmit documents relating to the scheme, as set forth in the Superseding
> Indictment.

ROA, Vol. 1 at 485.

Mr. Kalu argues the Government was required to prove he acted with the specific

intent to defraud.  *See United States v. Taylor*, 832 F.2d 1187, 1192 (10th Cir. 1987);

*United States v. Gamble*, 737 F.2d 853, 856 (10th Cir. 1984).  He contends intent is an

element of mail fraud whether a defendant is charged with devising a scheme to defraud

or a scheme to obtain money by false pretenses.  *See United States v. Haber*, 251 F.3d

881, 887 (10th Cir. 2001); Tenth Circuit Pattern Jury Instruction No. 2.56.

The Government argues the jury instructions were not erroneous.  The Tenth

Circuit indicated in *United States v. Cronic*, 900 F.2d 1511, 1513 (10th Cir. 1990), that

§ 1341 establishes two separate if overlapping offenses: a scheme to defraud and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises. The Government contends only the former includes the element of intent to defraud. Because Mr. Kalu was charged with only the latter, it argues a jury instruction regarding intent to defraud was unnecessary.

a. *The district court erred by failing to instruct on intent to defraud*

Mr. Kalu correctly recognizes that intent to defraud is an element of § 1341. The district court erred by failing to instruct the jury on this element.

The underlying premise of the Government's argument—that § 1341 contains two separate offenses with distinct elements—is incorrect. The Supreme Court has clarified since this court decided *Cronic* that § 1341 contains a single offense and does not separately prohibit a "scheme or artifice to defraud" and a scheme or artifice "for obtaining money or property by means of false or fraudulent pretenses." *See Loughrin v. United States*, 134 S. Ct. 2384, 2391 (2014); *Cleveland v. United States*, 531 U.S. 12, 25-26 (2000).[11] Our more recent decisions also recognize that § 1341 contains a single

_____

[11] Because Tenth Circuit case law previously construed § 1341 to contain two independent offenses, we wish to explain how that construction has been undermined by Supreme Court decisions elaborating upon *McNally v. United States*, 483 U.S. 350, 356-58 (1987) (superseded by statute on other grounds). *McNally* examined the history of § 1341 and explained that "adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations to the future as well as other frauds involving money or property." *Id.* at 359.

In *Cleveland*, the Supreme Court rejected the argument "that § 1341, as amended in 1909, defines two independent offenses: (1) 'any scheme or artifice to defraud' and

Continued . . .

-13-

offense, and reiterate that intent to defraud is a necessary element of mail fraud. *See*

*United States v. Zar*, No. 13-1111, Slip Op. at 22 (10th Cir. 2015) (observing "*Cleveland*

. . . effectively overruled *Cronic*").

---

Cont.

(2) 'any scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" 531 U.S. at 25-26. The *Cleveland* Court invoked *McNally*, observing that "[w]ere the Government correct that the second phrase of § 1341 defines a separate offense, the statute would appear to arm federal prosecutors with power to police false statements in an enormous range of submissions to state and local authorities." *Id.* at 26. It "declin[ed] to attribute to § 1341 a purpose so encompassing where Congress has not made such a design clear." *Id.*

Last year in *Loughrin*, the Court more strongly emphasized that "despite the word 'or,' *McNally* understood [§ 1341] as setting forth just one offense—using the mails to advance a scheme to defraud." 134 S. Ct. at 2391. The *Loughrin* Court acknowledged that, in 1984, "every Court of Appeals to have addressed the issue had concluded that the two relevant phrases of the mail fraud law must be read 'in the disjunctive' and 'construed independently,'" but underscored that "*McNally* disagreed, eschewing the most natural reading of the text in favor of evidence it found in the drafting history of the statute's money-or-property clause." *Id.* It stressed that the *McNally* Court examined both phrases in § 1341 and established "the back clarified that the front included certain conduct, rather than doing independent work." *Id.*

In light of *Cleveland* and *Loughrin*, our previous precedent indicating § 1341 contains two separate offenses appears untenable. The Government relies on that precedent to suggest that intent to defraud is only necessary when proving a scheme to defraud and not necessary when proving a scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. Although this court did indicate in *Cronic* that § 1341 contained two offenses after the Supreme Court decided *McNally*—perhaps assuming *McNally* resolved only the question of how courts should define "scheme or artifice to defraud"—the Court's subsequent decisions in *Cleveland* and *Loughrin* underscore that *McNally* stands for the principle that § 1341 contains only a single offense. Construed as a single offense, it is clear that intent to defraud is an element of mail fraud under § 1341. *See United States v. Zar*, No. 13-1111, Slip Op. at 22 (10th Cir. 2015); *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003).

In post-*Cleveland* decisions, we have consistently indicated that specific intent to defraud is an element of a § 1341 offense. *See United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) ("The elements of federal mail fraud as defined in 18 U.S.C. § 1341 are (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme."); *see also United States v. Porter*, 745 F.3d 1035, 1050 (10th Cir. 2014) (reiterating elements set forth in *Welch*); *United States v. Schuler*, 458 F.3d 1148, 1152 (10th Cir. 2006) (same). Even when our decisions construed § 1341 to contain two offenses, they required specific intent to defraud for each of them. *See, e.g.*, *United States v. Deters*, 184 F.3d 1253, 1257 (10th Cir. 1999) ("The essential elements of fraud under 18 U.S.C. § 1341 are (1) the devising of a scheme either to (a) defraud or (b) obtain money through false or fraudulent pretenses, representations, or promises; (2) a specific intent to defraud; and (3) the use of the United States mails to execute the scheme."); *see also Haber*, 251 F.3d at 887 (same); *United States v. Gigot*, 147 F.3d 1193, 1196 n.2 (10th Cir. 1998) (same); *United States v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995) (same). The list of these essential elements indicates specific intent to defraud applies to all § 1341 violations.

The Government does not cite any authority that affirmatively indicates specific intent to defraud is *not* a requirement of an "obtaining money or property" offense.[12] We conclude proof of intent to defraud is required for a scheme to obtain money or property, and the district court erred in failing to include this element in Instruction 17.

b. *The error was plain*

Having identified error, we determine the error was plain. We measure plain error at the time of appeal. *See United States v. Cordery*, 656 F.3d 1103, 1107 (10th Cir. 2011). The Supreme Court's construction of § 1341 was established long before the appeal was filed, *see, e.g.*, *Cleveland*, 531 U.S. at 25-26 (construing the relevant statute in 2000), and our own case law identifying intent as an element of a § 1341 offense similarly predated the appeal, *see, e.g.*, *Welch*, 327 F.3d 1104 (listing the elements for the relevant statute in 2003). Although the Government now argues otherwise, its briefing to the district court indicated it too understood intent to defraud is an element of § 1341, and observed "a separate good faith instruction is unnecessary where a district court properly instructs the jury on the element of intent to defraud," ROA, Vol. 1 at 381-82, and "the

---

[12] Our case law identifies "an intent to defraud" as the second element of a § 1341 offense. *See Porter*, 745 F.3d at 1050; *Schuler*, 458 F.3d at 1152; *Welch*, 327 F.3d at 1104. Our pattern jury instructions describe this second element as "specific intent to [defraud] [obtain money or property by false or fraudulent pretenses, representations or promises]." Tenth Circuit Pattern Jury Instruction 2.56. We note the instructions define the intent requirements synonymously, specifying that "an 'intent to [defraud] [obtain money or property by means of false or fraudulent pretenses, representations, or promises]' means an intent to deceive or cheat someone." Tenth Circuit Pattern Jury Instruction 2.56. All § 1341 offenses require an intent to defraud.

United States' proposed instruction for the element of mail fraud includes the mens rea element of intent to defraud," ROA, Vol. 1 at 383. We consider the error plain, and therefore conclude Mr. Kalu has satisfied the second step of plain error review.

c. *The erroneous instruction does not warrant reversal*

Having demonstrated plain error, Mr. Kalu must also show the error "affects substantial rights" and "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Bedford*, 536 F.3d at 1153 (quotations omitted). Mr. Kalu's primary defense was that he acted in good faith because he trusted the legal advice of counsel and relied upon AU to honor its contractual obligations toward the nurses. He contends the district court rendered that defense irrelevant by not requiring the jury to find intent to defraud, and that this constituted reversible error. These arguments are unavailing.

Mr. Kalu has not shown the error affected his substantial rights. "Satisfying the third prong of plain-error review—that the error affects substantial rights—'usually means that the error must have affected the outcome of the district court proceedings.'" *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732-33 (10th Cir. 2005) (en banc) (quoting *United States v. Cotton*, 535 U.S. 625, 632 (2002)). "To meet this burden, the appellant must show 'a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *Id.* at 733 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)). No such probability exists in this case.

-17-

The Tenth Circuit has repeatedly noted that, because fraudulent intent is difficult to prove with direct evidence, it may be inferred from circumstantial evidence considered in its totality. *See Porter*, 745 F.3d 1054; *Schuler*, 458 F.3d at 1152; *Welch*, 327 F.3d at 1105; *United States v. Trammell*, 133 F.3d 1343, 1352 (10th Cir. 1998); *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997); *Taylor*, 832 F.2d at 1192-93.[13] "Intent may be inferred from evidence that the defendant attempted to conceal activity. Intent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use." *Prows*, 118 F.3d at 692 (quoting Kathleen Flavin & Kathleen Corrigan, *Eleventh Survey of White Collar Crime: Mail Fraud and Wire Fraud*, 33 Am. Crim. L. Rev. 861, 869-70 (1996) (citations and internal punctuation omitted)).

Here, the record amply demonstrates Mr. Kalu misrepresented the details of the nurses' employment and salaries to the nurses and to immigration officials, knew the statements he was making were false, and profited from the scheme. Emails from Mr. Kalu indicated he would repay visa, attorney, and transportation fees to the foreign nationals, and testimony at trial indicated he did not. The foreign nationals testified Mr. Kalu misled them about who their employer would be, what they would do, and how much they would be paid. The foreign nationals testified Mr. Kalu was not merely a

---

[13] We note the principle does not relieve the Government of its burden to show intent, it merely allows the Government to satisfy the burden using inferential evidence.

middleman, but the primary or only person with whom they interacted who represented AU. Although Mr. Kalu attempts to blame advice of counsel, the Government presented testimonial and documentary evidence of Mr. Kalu's misrepresentations to Ms. Perez and the government regarding AU, the program for the nurses, and what the foreign nationals would do and how they would be paid. Because this evidence fully demonstrated intent for the purposes of a fraud conviction, Mr. Kalu has not shown a reasonable probability that, but for the error, the outcome of the trial would have been different.

Beyond the evidence, the jury was instructed on the question of Mr. Kalu's knowledge and found Mr. Kalu knew the representations were false and that Mr. Kalu did not act in good faith. On appeal, Mr. Kalu himself acknowledges his false statements were established at trial. *See* Aplt. Br. at 22 ("[T]he jury concluded that Mr. Kalu either was directly responsible for, or aided and abetted, the making of false statements.").

Because Mr. Kalu does not and cannot demonstrate he satisfies the third step of plain error review, we affirm the district court.[14]

2. **Constructive Amendment (Instruction 17)**

Mr. Kalu next contends the district court's mail fraud instruction constructively amended the superseding indictment. Although the indictment alleged Mr. Kalu "devised

---

[14] Mr. Kalu argues that if we reverse any convictions on Counts 1-64—which encompass the mail fraud convictions—we must also reverse his money laundering convictions on Counts 65-95. Because we do not reverse any convictions on Counts 1-64, we do not reach this argument.

and intended to devise a scheme," ROA, Vol. 1 at 92, Instruction 17 required the jury to find only that he "knowingly participated in a scheme or plan to obtain money or property from another person through false representation," ROA, Vol. 1 at 485. In Instruction 18, the court specified that, to convict Mr. Kalu, "it is not necessary that the Government show that Mr. Kalu created the scheme or plan himself or with others, only that he purposefully took part in helping to operate the scheme or plan." ROA, Vol. 1 at 486.

Mr. Kalu observes the grand jury only charged him with devising or intending to devise a scheme, and contends the district court constructively amended the indictment by allowing him to be convicted for merely participating in it. "[I]t is a fundamental precept of federal constitutional law that a court cannot permit a defendant to be tried on charges that are not made in the indictment." *Hunter v. New Mexico*, 916 F.2d 595, 598 (10th Cir. 1990) (quotations omitted). A court constructively amends the indictment "if the evidence presented at trial and the instructions raise the possibility that a defendant may have been convicted on a charge other than that alleged in the Indictment." *Davis*, 55 F.3d at 520-21. We have identified two dangers of constructive indictments: (1) the defendant must answer a charge that had not been brought by a grand jury, and (2) the defendant is denied sufficient notice to present and prepare an adequate defense. *See Hunter*, 916 F.2d at 599.

We conclude the district court did not constructively amend the indictment and did not err in its instruction. In this instance, the jury instructions reflected the charges in the

superseding indictment. The indictment, like the mail fraud statute, referred to Mr. Kalu's "having devised or intending to devise" a scheme, while the jury was instructed it could find him guilty if he "knowingly participated" in the scheme. Because the Tenth Circuit has construed the phrase "devised or intending to devise" to include knowing participation in a scheme, Mr. Kalu has not shown the district court broadened the charge in the indictment. "[U]nder well-established Tenth Circuit precedent a defendant may be convicted under [§ 1341] if the government shows that the defendant joined a scheme devised by someone else, as long as the defendant possessed the intent to defraud." *Prows*, 118 F.3d at 692; *see also United States v. Washita Constr. Co.*, 789 F.2d 809, 817 (10th Cir. 1986); *Gamble*, 737 F.2d at 856; *United States v. Gann*, 718 F.2d 1502, 1505 (10th Cir. 1983) (holding a defendant "may be convicted of mail fraud if he knowingly and willfully participates in a fraudulent scheme created and set in motion by others").[15]

The use of the term "knowingly participated" instead of "devised or intended to devise" did not alter any of the essential elements of a § 1341 offense,[16] nor did it

---

[15] *Prows*, *Washita Construction*, and *Gamble* suggest the defendant may be convicted for participation in a scheme under § 1341 if they have the intent to defraud. *Gann*, however, merely references knowing and willful participation in a scheme. As discussed above, the evidence at trial would support conviction as a participant in a scheme under either the intent or knowledge standard.

[16] As noted above, the relevant elements are "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme." *Welch*, 327 F.3d at 1104. Whether a person devises or participates in the scheme is not an element of the offense.

prejudice Mr. Kalu's defense at trial. The superseding indictment specified how Mr. Kalu participated in the scheme in its description of the mail fraud offense, detailing the precise acts at issue.[17] All of these acts were based on Mr. Kalu's participation, and none were based on Mr. Kalu having devised or intended to devise the scheme. In light of our precedent and the superseding indictment, Mr. Kalu has not demonstrated "the evidence presented at trial and the instructions raise the possibility that [he] may have been convicted on a charge other than that alleged in the Indictment." *Davis*, 55 F.3d at 520-21; *see United States v. Farr*, 536 F.3d 1174, 1180 (10th Cir. 2008) (citing *United States v. Miller*, 471 U.S. 130, 144 (1985)).

Because Mr. Kalu has not demonstrated that the district court constructively amended the indictment, we do not identify any error. We conclude the district court's instructions were proper. We need not proceed to the remaining steps of plain error review.

3. **Knowledge or Reckless Disregard (Instruction 23)**

Mr. Kalu alleges the jury instructions misstated the necessary mens rea for encouraging or inducing an alien. Mr. Kalu was convicted under 8 U.S.C. § 1324, which states in relevant part that if a person "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such

---

[17] The indictment also charged the defendant with aiding and abetting, putting Mr. Kalu on notice that he could be criminally liable for participation in the scheme. *Zar*, No. 13-1111, Slip Op. at 25.

coming to, entry, or residence is or will be in violation of law," and does so "for the purpose of commercial advantage or private financial gain," that person shall be fined, imprisoned for up to 10 years, or both. 8 U.S.C. § 1324(a)(1)(A)(iv), (a)(1)(B)(i). The superseding indictment charged Mr. Kalu in accordance with the statute, indicating he

> did encourage and induce the aliens identified below to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence was or would be in violation of the law, and for the purpose of commercial advantage and private financial gain.

ROA, Vol. 1 at 97.

The district court did not instruct the jury with the knowledge or recklessness standard used in the statute and indictment. Instead, Instruction 23 used a knowledge or negligence standard, and indicated the evidence must show that "Mr. Kalu knew or should have known that the person's entry into or residence in the United States would be in violation of the law." *Id.* at 492. In Instruction 24, the court clarified that "[i]n determining whether the Government has proven that Mr. Kalu 'knew or should have known' that a person's entry into or residence in the United States would be contrary to law," the jury should consider Instruction 19, which defined what it means to act "knowingly" and explained the good faith defense. *Id.* at 493. It also defined "should have known," noting "[a] person 'should have known' of a fact if that person knew of circumstances that would lead a reasonable person to conduct a further inquiry into a matter, and such further inquiry, had it been conducted, would reasonably have resulted in the person learning of the fact." *Id.* at 493.

-23-

Mr. Kalu contends the "should have known" instruction was insufficient and inconsistent with the statute, our pattern instructions, and the instruction proposed by the Government. *See* Tenth Circuit Pattern Jury Instructions 2.03, 2.04. Mr. Kalu contends that a mens rea of knowledge or recklessness is an element of the crime charged, and the jury instructions allowed him to be convicted on a negligence standard. *Uresti-Hernandez*, 968 F.2d at 1045-46. The Government disagrees, and argues that because the statute does not define the words "reckless disregard," it is sufficient that a defendant is merely "aware of" the alien's status and acted willfully in furtherance of the alien's violation. *See United States v. Franco-Lopez*, 687 F.3d 1222, 1226-27 (10th Cir. 2012). The Government contends the district court's instruction was not plainly erroneous.

a. *The district court erred by instructing the jury with a "should have known" standard*

We conclude Mr. Kalu is correct that the district court erred by instructing the jury with a negligence standard rather than the actual knowledge or reckless disregard standard specified in the statute. A finding of "actual knowledge or reckless disregard" is an element of a § 1324 offense. Demonstrating Mr. Kalu "should have known" of the foreign nationals' status, which is equivalent to a negligence standard, does not suffice under the statutory text, our case law, or the case law in other circuits.

First, we note the statute itself specifies the encouragement or inducement at issue must be "knowing or in reckless disregard of the fact that such coming to, entry, or

-24-

residence is or will be in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iv). The only mens rea specified is knowledge or recklessness—not negligence.

Second, the Tenth Circuit has not suggested a violation of § 1324 is established by anything less than knowledge or reckless disregard. The case cited by the Government—*Franco-Lopez*—relied on the Tenth Circuit's en banc decision in *United States v. Barajas-Chavez*, which said a determination "that the defendant was aware of the alien's status" and "that the defendant acted willfully in furtherance of the alien's violation of the law" were both elements of § 1324(a)(1)(A)(ii). 162 F.3d 1285, 1287 (10th Cir. 1999) (en banc) (quotations omitted).[18] The Government suggests the term "aware of" is ambiguous and could permit a "should have known" mens rea, but neither *Barajas-Chavez* nor the decisions it cites are ambiguous about the required mens rea. In *Barajas-Chavez*, the court made clear that "[t]he statute requires that a defendant know or act in reckless disregard of the fact that an individual is an illegal alien, and that defendant's transportation or movement of the alien will help, advance, or promote the alien's illegal entry or continued illegal presence in the United States." 162 F.3d at 1288.

The decisions from the Fifth, Seventh, and Eighth Circuits that are cited by *Barajas-Chavez* are similarly clear. *See Barajas-Chavez*, 162 F.3d at 1287 (citing *United*

---

[18] *Barajas-Chavez*, 162 F.3d 1285, and *Franco-Lopez*, 687 F.3d 1222, dealt with other forms of bringing in and harboring foreign nationals prohibited under related subsections of § 1324. Because §§ 1324(a)(1)(A)(ii)-(iv) all contain an identical "actual knowledge or in reckless disregard of the fact" element, however, we consider these cases instructive when construing that element of § 1324(a)(1)(A)(iv).

*States v. Parmelee*, 42 F.3d 387, 391 (7th Cir. 1994); *United States v. Diaz*, 936 F.2d 786, 788 (5th Cir. 1991); *United States v. Hernandez*, 913 F.2d 568, 569 (8th Cir. 1990)). All of these decisions required a determination the defendant acted knowingly or recklessly. *See Parmelee*, 42 F.3d at 391 ("[W]e hold that a defendant's guilty knowledge that his transportation activity furthers an alien's illegal presence in the United States is an essential element of the crime stated in [§ 1324]."); *Diaz*, 936 F.2d at 788 ("The alien's status is an essential element, as is the defendant's knowledge of the illegal status and her knowing and intentional furtherance of the violation of the law by the alien." (citations omitted)); *Hernandez*, 913 F.2d at 569 (identifying "four elements to show a violation" of § 1324, including that "the alien was in the United States in violation of the law," "this was known to defendant," and "the defendant acted willfully in furtherance of the alien's violation of the law").[19] Any ambiguity is further clarified by the Tenth Circuit pattern jury instructions for § 1324(a)(1)(A)(ii), which include as an element that "the defendant knew, or recklessly disregarded the fact, that [name of alien] was not lawfully in the United States." Tenth Circuit Pattern Jury Instruction 2.03; *see also* Tenth Circuit Pattern

---

[19] Only the Fifth Circuit's decision specifically referred to the defendant being "aware of" the foreign national's status, and it clarified that knowledge of unlawful status and knowing and intentional furtherance of the violation were both essential elements of the offense. *See Diaz*, 936 F.2d at 788.

Jury Instruction 2.04 (requiring knowledge or reckless disregard under

§ 1324(a)(1)(A)(iii)).[20]

Third, the other cases the Government cites require a similar showing of

knowledge or reckless disregard.  The Government misreads *United States v. Kendrick*,

which did not use an "aware of" standard divorced from the proper mens rea.  *See* 682

F.3d 974, 984 (10th Cir. 2012) (specifying "the government must prove beyond a

reasonable doubt that the defendant . . . knew or recklessly disregarded the fact that the

alien had not received prior official authorization to come to or enter the United States,"

and explaining that "[t]o act with 'reckless disregard' means to be aware of, but

consciously and carelessly ignore, facts and circumstances clearly indicating that the

person transported was an alien who had entered or remained in the United States in

violation of law" (quotations omitted)).  Other decisions that use the "aware of" language

unambiguously require that a defendant know or act with reckless disregard.  *See, e.g.*,

*United States v. Guerrero-Damian*, 241 F. App'x 171, 173 (4th Cir. 2007) (unpublished)

(citing *Barajas-Chavez* but reviewing whether the defendant "knew or acted with

reckless disregard of the fact that the aliens were in the country illegally"); *United States*

---

[20] The Tenth Circuit does not have pattern jury instructions for the specific subsection at issue, § 1324(a)(1)(A)(iv).  The pattern instruction for § 1324(a)(1)(A)(ii), which prohibits other forms of bringing in and harboring foreign nationals under the same statute, specifically states that "'[r]eckless disregard' means deliberate indifference to facts which, if considered and weighed in a reasonable manner, indicate the highest probability that the alleged aliens were in fact aliens and were in the United States unlawfully."  Tenth Circuit Pattern Jury Instruction 2.03.

*v. Williams*, 132 F.3d 1055, 1059 (5th Cir. 1998) ("The defendant's knowledge of the alien's illegal status is an essential element of the offense."). The Government cites no authority suggesting the use of the term "aware of" allows the prosecution to satisfy the essential elements of the offense by demonstrating a defendant "should have known" an alien's entry or residence would be illegal.

The statute, our decision in *Barajas-Chavez*, and case law from other circuits do not support the contention that a defendant acts in "knowing or in reckless disregard of the fact[s]" when they merely "should have known" an alien's coming to, entry, or residence in the United States is illegal. The phrase "aware of" in our precedents is not satisfied by showing Mr. Kalu "should have known" the aliens' coming to, entry, or residence in the United States would be illegal. Under the jury instructions provided by the district court, the jury was allowed to convict Mr. Kalu under a less demanding mens rea than contained in the statute—negligence rather than knowledge or recklessness—and that constituted error.

b. *The error was plain*

In light of the consistent use of a knowledge or recklessness mens rea in the statute, our case law, and the case law of other circuits—and in the absence of any authority suggesting a negligence standard would suffice—we consider the error in this instance plain. The instructions did not "correctly state the governing law," and the error was "clear or obvious under current law." *United States v. Bader*, 678 F.3d 858, 868

(10th Cir. 2012) (quotations omitted).  We thus proceed to the remaining steps of plain error review.

   c.  *The erroneous instruction does not warrant reversal*

Having determined that the district court plainly erred, we must determine whether the error affected Mr. Kalu's substantial rights or seriously affected the fairness, integrity, or public reputation of the proceedings.  We do not believe Mr. Kalu has made this showing and thus do not consider the error reversible under plain error review.

The erroneous jury instruction does not satisfy the third element of plain error review because there is not "a reasonable probability that the error affected the outcome of the trial."  *Id.* (quotations omitted).  Mr. Kalu has not demonstrated a reasonable probability that the outcome would have been different if the jury had been required to find Mr. Kalu acted with knowledge or in reckless disregard of the foreign nationals' illegal entry or residence.  The prosecution presented substantial evidence of Mr. Kalu's actual knowledge at trial.

The evidence demonstrated Mr. Kalu knew the nurses' immigration status, advised them in the visa process and their interactions with immigration officials, and coordinated their transportation into the United States.  It showed he was informed of the requirements for the nurses to lawfully obtain an H-1B visa and the conditions he needed to satisfy for their entry and presence in the United States to be legal.  Finally, the evidence revealed Mr. Kalu actively concealed from his attorney aspects of the foreign nationals' proposed employment that would have disqualified them from entering the

country. Mr. Kalu was not a peripheral player in the fraud. He oversaw every step of the process before, during, and after the foreign nationals' entry into the United States. This is not a case where a defendant "had a plausible defense to the charges against him primarily because of his professed lack of knowledge and alleged detachment from the process of hiring the workers in question and verifying their immigration status." *De Oliveira v. United States*, No. 5:09-CR-50035, 2014 WL 2873888, at \*7 (W.D. Ark. June 24, 2014).[21] Because the evidence demonstrated Mr. Kalu had actual knowledge that the foreign nationals' entry into or residence in the United States would violate the law, the error did not affect his substantial rights.

Mr. Kalu has not demonstrated a reasonable probability that the plain error in Instruction 23 affected the outcome of his trial. We therefore conclude Mr. Kalu has not satisfied the third step of plain error review and affirm the district court.

4. **Threat of Serious Harm (Instruction 31)**

Mr. Kalu further argues the jury instructions incorrectly defined "serious harm," thereby lowering the threshold for a forced labor conviction. Mr. Kalu was convicted under the forced labor statute, which prohibits knowingly providing or obtaining labor or services by a variety of means, including "serious harm or threats of serious harm." 18 U.S.C. § 1589(a). The statute defines "serious harm" to include

---

[21] In *De Oliveira*, the defendant admitted he "should have known" foreign nationals were unlawfully present in the country, and the court said this did not meet the statutory standard of actual knowledge or reckless disregard. 2014 WL 2873888, at \*6.

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to *compel* a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2) (emphasis added).  The superseding indictment charged Mr. Kalu in accordance with the statute.

Mr. Kalu argues the district court erred by defining "serious harm" in such a way that it encompassed acts that caused, rather than compelled, the nurses to continue performing labor to avoid incurring harm.  Instruction 31 defined "serious harm" as

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to *cause* a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

ROA, Vol. 1 at 500 (emphasis added).

Mr. Kalu argues the district court plainly erred by failing to instruct the jury he could only be found guilty under the forced labor statute if his threats compelled—rather than caused—the nurses to provide labor involuntarily.  Mr. Kalu contends that the definition of "compel" is narrower than the definition of "cause," and that the error allowed the jury to convict Mr. Kalu without requiring the Government to prove each element of forced labor beyond a reasonable doubt.

The Government argues the jury instructions on the forced labor counts were not plainly erroneous.  It urges us to consider Instruction 32, which generally advised the jury that, to determine whether labor or services were provided "involuntarily," they should

consider whether "as a result of Mr. Kalu's use of the unlawful means discussed above, the person named in the count continued to provide labor or services where, if Mr. Kalu had not resorted to those unlawful means, the person would have declined to perform additional labor or services." ROA, Vol. 1 at 501. Instruction 32 also directed the jury to consider all of the surrounding circumstances when determining whether the nurses "chose to perform the labor or services voluntarily or involuntarily," whether they were "compelled to keep working," and whether they provided labor or services "involuntarily." *Id.* The Government argues any distinction between the terms "compel" and "cause" did not undermine Mr. Kalu's defense because the jury was still required to find that the nurses would not have performed the labor and services in the absence of Mr. Kalu's threats and other unlawful means. *See id.* It maintains that, in light of the instructions as a whole, any potential distinction between causing and compelling would be a distinction without a difference.

We conclude Mr. Kalu has not demonstrated the district court erred in its instruction. First, Mr. Kalu does not cite any authority indicating that harm that "causes" but does not "compel" a person to provide labor falls short of a violation of § 1589. His cited authorities repeat the definition of "serious harm" contained in the statute, including the word "compel," but do not suggest that inflicting harm sufficiently serious to "cause" a person to continue performing labor would fall short of that standard. *See, e.g.*, *United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011) (paraphrasing the statutory definition of "serious harm" without discussing whether compulsion and causation

-32-

differ); *Garcia v. Curtright*, No. 6:11-06407-HO, 2012 WL 1831865, at 3-4 (D. Or. May 17, 2012) (unpublished). Indeed, one of Mr. Kalu's authorities uses causation language to define a violation of § 1589. *David v. Signal Int'l, LLC*, No. 08-1220, 2012 WL 10759668, at *19 (E.D. La., Jan. 4, 2012) (determining "the concept of . . . forced labor turns on whether the victim rendered labor *because* of the verboten physical force or legal coercion" (emphasis added)).

The evidence at trial demonstrated Mr. Kalu repeatedly threatened the foreign nationals with legal action, revocation of their visas, deportation, and financial ruin, and some individuals testified he put them in fear of physical harm. These are precisely the types of threats that could "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm. 18 U.S.C. § 1589(c)(2). Mr. Kalu does not cite any authority suggesting that "causing" and "compelling" are materially different in this context or that "causing" someone to provide labor by means of physical or nonphysical harm is permissible under the statute while "compelling" someone is not.

Second, the jury instructions as a whole are not erroneous. Instruction 32 advised the jury to consider whether "as a result of Mr. Kalu's use of the unlawful means described above, the person named in the count continued to provide labor or services where, if Mr. Kalu had not resorted to those unlawful means, the person would have declined to perform additional labor or services," and encouraged the jury to "consider all of the attendant circumstances in determining whether the person chose to perform the

-33-

labor or services voluntarily or involuntarily." ROA, Vol. 1 at 501. Although these instructions were given to aid the jury in determining "whether the Government has proven that 'because of Mr. Kalu's actions, the person named in the count provided that labor or services involuntarily,'" *id.*, and although the latter phrase was never included in any other instruction, the inclusion of the involuntariness instruction adds to the overall message in the instructions that the jury had to determine Mr. Kalu's threats of harm were sufficiently serious to compel the nurses' labor.

This ends the inquiry. Mr. Kalu bears the burden of demonstrating error and showing that error is plain. He has not demonstrated the use of the word "cause" instead of "compel" when defining "serious harm" was erroneous, much less plainly erroneous, and his argument accordingly fails.

## B. *Restitution*

Mr. Kalu challenges the $3,790,338.55 restitution award as based on improper methodology and inadequate evidence.[22]

---

[22] The Government argues Mr. Kalu did not raise his precise objection before the district court and contends the proper standard of review is plain error. The record shows Mr. Kalu objected to the calculation of the restitution award and the documentation used to support it. ROA, Vol. 4 at 2803-04 ("[T]he nurses who spent four weeks in trial this past summer alleging that the contract with Mr. Kalu was fake or a sham now want specific performance under the contract. . . . I don't believe that's the kind of lost wages contemplated by the restitution statute."); *id.* at 2804-05 ("And by my count, there are only two pieces of supporting evidence. . . . Everything else is a restitution—a victim impact statement where a victim involved in the case says, I believe I'm entitled to X, Y, and Z. But there is nothing to back it up. It's just a statement of what they want, what they feel they're entitled to, but no receipts or anything of that nature to back up the

Continued . . .

"We review the district court's application of the [Mandatory Victims Restitution Act ("MVRA")] *de novo*, review its factual findings for clear error, and review the amount of restitution awarded for abuse of discretion." *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008); *see United States v. Shengyang Zhou*, 717 F.3d 1139, 1152 (10th Cir. 2013). "[A] district court may not order restitution in an amount that exceeds the actual loss caused by the defendant's conduct, which would amount to an illegal sentence constituting plain error." *United States v. James*, 564 F.3d 1237, 1243 (10th Cir. 2009).

The MVRA instructs sentencing courts to order restitution to victims of "offense[s] against property . . . committed by fraud or deceit" without considering the economic circumstances of the defendant. 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii); 3664(f)(1)(A). The Government bears the burden of proving the amount of loss by a preponderance of the evidence. 18 U.S.C. § 3664(e); *Gallant*, 537 F.3d at 1247. The MVRA does not require "absolute precision," *id.* at 1252, but losses cannot be "speculative," *United States v. Serawop*, 505 F.3d 1112, 1123 (10th Cir. 2007).

The district court awarded restitution to the nurses based on the AU job offer in the H-1B petitions, which offered them three-year positions with an annual salary of

---

Cont.

claim."). We believe these objections suffice to call the district court's methodology into question and opt to review the restitution award.

$72,000. The court calculated the nurses' loss by identifying the salaries Mr. Kalu promised to pay them and subtracting the money they actually made from their employment during that period. As the court noted, the restitution awarded is therefore "not an enforcement of the contract," but "a loss created by false representation." ROA, Vol. 4 at 2882. Using this formula, the district court arrived at a total restitution figure of $3,790,338.55.

Mr. Kalu argues the restitution award is faulty for two reasons. First, the $72,000 figure in the AU employment offer differed from the representation on Mr. Kalu's website, which said the nurses could earn up to $72,000 per year based on earning $20/hour plus $30/hour for overtime beyond a 40 hour workweek. Many of the nurses indicated they had been told they would be paid $20/hour in their direct communications with Mr. Kalu. Mr. Kalu argues the nurses were only promised up to $72,000, not guaranteed $72,000. Second, the court's restitution calculation assumed each of the 26 nurses in question would have worked for the full three years of their proposed employment, when the evidence presented at trial suggested many nurses would not work for that duration. Mr. Kalu argues the case should be remanded for the district court to enter a non-speculative restitution award.

We conclude the district court did not abuse its discretion in calculating restitution. "A sentencing court may resolve restitution uncertainties with a view towards achieving fairness to the victim, so long as it still makes a reasonable determination of appropriate restitution rooted in a calculation of loss." *Gallant*, 537 F.3d at 1252

(quotations omitted). We have therefore said that "in the case of fraud or theft, the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the information available." *Id.* (quotations omitted).

First, Mr. Kalu's argument that some of his victims did not expect to make $72,000 per year is unpersuasive. Disputes over the amount of restitution are resolved by a preponderance of the evidence, and the Government carries the burden of showing the amount of loss sustained by the victim as a result of the offense. The Government demonstrated Mr. Kalu made affirmative representations that he would pay the nurses $72,000 per year for three years, and those representations—filed in the form of visa applications—provide clear and objective evidence of the promised value of the employment. As the district court noted at the conclusion of its evidentiary hearing to determine the proper amount of restitution, Mr. Kalu failed to present a better alternative mechanism for calculating actual loss.[23] Of the evidence presented at trial, the loss created by false representation provides the most "reasonable estimate of the loss, given the information available." *Gallant*, 537 F.3d at 1252 (quotations omitted).

---

[23] In district court, Mr. Kalu proposed as an alternative that foreign nationals could show actual loss only "if they can make the argument that they were out of work, that they had some other employment opportunity, and that Mr. Kalu was the cause of them not being able to take advantage of that other opportunity." ROA, Vol. 4 at 2864-65. Like the district court, we fail to see how this provides a better calculation of actual loss. It does not account for the promises Mr. Kalu made to induce the foreign nationals to spend considerable sums of money, uproot themselves, and come to the United States, nor does it recognize how the H-1B visa he arranged restricted the foreign nationals' mobility and employment opportunities.

Moreover, subsequent communications regarding salary expectations are irrelevant if the Government demonstrates the visa applications promised to pay a salary of $72,000 and this promise was necessary to secure the H-1B visas that allowed the nurses to enter the United States and work for Mr. Kalu. The Tenth Circuit recently reiterated "the principal aim of such restitution is to ensure that crime victims, to the extent possible, are made whole for their losses," and that "[t]his means restoring victims to the position they occupied before the crime." *United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015). Whether Mr. Kalu had previously promised victims only $20/hour ceased to be relevant when he filed visa paperwork promising them $72,000 annually in an employment period extending up to three years, as required under federal law. Once the applications were submitted and the visas were granted, the nurses had been promised that salary by Mr. Kalu and had a legitimate expectation they would receive it. The district court did not abuse its discretion by determining that "restoring victims to the position they occupied before the crime" required paying them the salary on which their entry into the United States and subsequent employment was premised. *Id.*[24]

---

[24] The district court subtracted the amount the nurses actually earned from these damages, which produced a calculation of actual loss that distinguishes this case from instances of double recovery or expectation damages unanchored in actual loss. *See, e.g.*, *Ferdman*, 779 F.3d 1129; *United States v. Frazier*, 651 F.3d 899, 905 (8th Cir. 2011); *United States v. Boccagna*, 450 F.3d 107, 109 (2d Cir. 2006).

Second, Mr. Kalu's argument that some of the nurses inevitably would not have worked the full three years under the scheme is unpersuasive. Mr. Kalu suggests it is *probable* some nurses would not have worked the full three years. But he does not indicate how we could determine if the award given by the district court exceeds the calculation of "actual loss," and does not explain how we could know which of the nurses would have terminated their employment early and adjust the restitution they receive accordingly. Indeed, testimony at trial established that many of the nurses terminated their employment precisely because Mr. Kalu reneged on his promises. Without evidence presented to the district court demonstrating that particular nurses would have worked less than the promised three years even if Mr. Kalu had upheld his end of the bargain, the district court was within its discretion to award the amount of loss created by false representation less the amount of income actually earned.[25] We therefore conclude the restitution award was proper.

---

[25] In *Serawop* this court affirmed a restitution award in the amount of the potential earning capacity of a deceased three-year-old child, and held "that the district court exercised its 'abundant discretion' when it crafted a restitution order to include the lost income." 505 F.3d at 1124; *see also United States v. Oslund*, 453 F.3d 1048, 1062-63 (10th Cir. 2006) (determining lost future income may be included in a restitution order). Mr. Kalu suggests the district court's determination that the women would work for the full three years was speculative, but *Serawop* clearly demonstrates that reasoned forecasting is permissible in the restitution context so long as the award does not exceed the calculation of actual loss. *Gallant*, 537 F.3d at 1247; *see also United States v. Ahidley*, 486 F.3d 1184, 1189 (10th Cir. 2007) (recognizing that, in calculating restitution, "courts are permitted to draw inferences from the totality of the circumstances through an exercise of logical and probabilistic reasoning" (quotations omitted)).

## III. CONCLUSION

For the foregoing reasons, we affirm Mr. Kalu's convictions and the amount of restitution awarded by the district court.