**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee/Cross-
      Appellant,

v.

MARK OLIC PORTER,

      Defendant - Appellant/Cross-
      Appellee.

Nos. 18-4081 & 18-4099

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:17-CR-00527-DB-1)**
_____

Daphne Oberg, Assistant Federal Public Defender (Kathryn N. Nester, Federal Public Defender; Scott Keith Wilson and Bretta Pirie, Assistant Federal Public Defenders, District of Utah, on the briefs), Salt Lake City, Utah, for the Defendant - Appellant/Cross-Appellee.

Max Lapertosa, Attorney (Eric S. Dreiband, Assistant Attorney General; Erin H. Flynn, Attorney, U.S. Department of Justice, with him on the brief), Washington, D.C. for the Plaintiff - Appellee/Cross-Appellant.
_____

Before **MATHESON**, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

Mark Olic Porter shouted racial epithets at Lucas Waldvogel, a seven-year-old African American who lived in Mr. Porter's apartment complex. After hearing Mr. Porter's language, the boy's father, Michael Waldvogel, confronted Mr. Porter, who then assaulted Mr. Waldvogel with a stun cane. Shortly thereafter, Mr. Waldvogel and his family moved out of the complex.

A jury convicted Mr. Porter of interfering with Mr. Waldvogel's housing because of Mr. Waldvogel's race, a violation of the Fair Housing Act, 42 U.S.C. § 3631. The district court sentenced Mr. Porter to nine months in prison. He appeals his conviction. The Government cross-appeals his sentence.

On direct appeal, Mr. Porter first argues the evidence was insufficient to show he assaulted Mr. Waldvogel because of his race. Based on our review of the trial evidence, we disagree and hold that a reasonable jury could find Mr. Porter guilty beyond a reasonable doubt. Mr. Porter also argues the district court plainly erred by allowing the prosecution's opening statement and closing arguments, the trial evidence, and the jury instructions to make it likely that the jury convicted him for his actions against Lucas rather than Michael Waldvogel, thereby constructively amending the indictment. We disagree and hold that the presentations at trial clearly identified Michael Waldvogel as the alleged victim.

On cross-appeal, the Government argues procedural sentencing error. It first argues the district court miscalculated the advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") because the evidence showed

2

that Mr. Porter committed an aggravated assault rather than a simple assault against Mr. Waldvogel. We disagree, holding the district court's implicit finding that Mr. Porter did not intend to inflict bodily harm was not clearly erroneous. The Government alternatively argues the district court erred when it failed to apply a base level of 10 under the applicable sentencing Guideline when Mr. Porter's offense involved "the use or threat of force against a person." We agree with the alternative argument and hold the district court erred in calculating Mr. Porter's sentence.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b), we affirm Mr. Porter's conviction and remand for resentencing.

## I.  BACKGROUND

### A.  *Factual Background*[1]

### 1.  The Incident

The assault occurred at the Adagio Apartments in Draper, Utah, where both men lived in 2016. Mr. Waldvogel and his neighbor, Kaitlin Adair, described the incident at trial.

On November 3, 2016, Ms. Adair returned home from work and saw Mr. Porter on his front patio. He spoke to her, first making small talk and then "talking about immigration." Record on Appeal ("ROA"), Vol. V at 246. Ms. Adair testified: "I don't remember specifically everything that he said, but I remember him saying that we need to

---

[1] The facts are based on the trial record.

3

exterminate all of the motherfucking niggers, but first we need to exterminate all the motherfucking nigger lovers." *Id.*[2]

During this conversation, seven-year-old Lucas Waldvogel, who is African American, was riding his scooter on the sidewalk within view of Mr. Porter's patio. Ms. Adair noticed that Mr. Porter's attitude changed when he saw Lucas: "He seemed to get more agitated. His volume seemed to increase. It seemed like he was getting louder because the boy was out there." *Id.* at 248. Ms. Adair withdrew from the conversation and considered calling the police. She did not do so.

Lucas went inside and informed his father "that there was a man outside shouting at him." *Id.* at 175. Mr. Waldvogel told Lucas to go back outside. When Lucas returned with the same complaint, Mr. Waldvogel went to the balcony of his apartment to see what was happening. He heard Mr. Porter say to Lucas, "[G]et out of here, nigger." *Id.* at 177.

Mr. Waldvogel ran outside toward Mr. Porter's apartment. As he approached, Ms. Adair summoned him. She warned him that Mr. Porter "ha[d] been saying some pretty crazy things out here while your boy has been out here." *Id.* at 250. She urged Mr. Waldvogel to "be cautious, because it looked like [Mr. Porter] had been drinking." *Id.*

_____

[2] We avoid inclusion of obscenities, racial slurs, and other offensive language in our opinions unless the word or phrase is central to our analysis and is a quotation from one of the parties. In this appeal, Mr. Porter challenges whether the evidence was sufficient for the jury to find improper racial motivation for his conduct. For the reader to understand the verdict and how we resolve this issue, we quote his obscenities and racial epithets that were presented to the jury.

She recalled that during this interaction, Mr. Waldvogel "didn't seem threatening" and "didn't make [her] feel nervous." *Id.*

She also explained:

> A. It didn't seem like Mr. Porter had great judgment at the time with everything that was going on and Mr. Waldvogel, I am not sure of his race or ethnicity, but he didn't look white, and so I was concerned that that might cause a problem.
>
> Q. When you say cause a problem, do you mean for the defendant?
>
> A. For Mr. Waldvogel.
>
> Q. Explain why.
> A. I was not sure if Mr. Porter would lash out or if he would be violent. With how he was acting, I believe that he might, that it might take that turn.
>
> Q. That is what you were trying to communicate to Mr. Waldvogel?
>
> A. Yes.

*Id.* at 251.

Mr. Waldvogel retrieved Lucas, and they began walking toward their apartment. As they passed Mr. Porter's patio, Mr. Porter came outside. Mr. Waldvogel approached the patio and said "something to the effect of . . . I don't care what you're saying in your house, but, you know, don't yell that stuff at my son." *Id.* at 180-81. Mr. Porter responded, "[Y]ou and your nigger son can get out of here." *Id.* at 181.

During this interaction, Mr. Porter was holding a stun cane in his hand near his right leg. The cane included a flashlight and a small barbed part on the end that, when

5

activated, would send an electric shock into anything it touched. Mr. Waldvogel testified, "[T]he next thing I remember was hearing the arcing of a device as it came over this side of my head and then it hit me on my neck." *Id.* at 182. The cane "pretty much incapacitated" Mr. Waldvogel, who fell to the ground. *Id.* at 183. Mr. Waldvogel then grabbed the stun cane and pulled it away from Mr. Porter. Mr. Waldvogel fell backward into the grass, and the stun cane broke. Ms. Adair testified that, during this encounter, Lucas "stayed away," *id.* at 252, and remained "far off on kind of the other side of the grassy area," *id.* at 251.

Mr. Porter announced he was going to call the police because Mr. Waldvogel had stolen his property. Mr. Waldvogel responded that he intended to call the police, and, after discarding the broken stun cane and walking back to his apartment, he did. Mr. Waldvogel next saw Mr. Porter leave the apartment complex in his car.

While Mr. Porter was away, three Draper Police Department officers responded to Mr. Waldvogel's call. They examined and photographed Mr. Waldvogel's neck, which had a small red mark, and asked whether Mr. Waldvogel needed medical attention. He declined. The Government introduced a picture of Mr. Waldvogel's neck at trial.

When Mr. Porter returned to the Adagio, the police arrested him. Mr. Waldvogel recounted that, during the arrest, Mr. Porter "was telling all the officers to F off. He called the officers nigger lovers and a lot of F bombs." *Id.* at 193.

Mr. Waldvogel testified that the altercation deeply affected Lucas. In the ensuing weeks, Lucas slept in Mr. Waldvogel's bed and insisted that Mr. Waldvogel block the

6

front door with a large elliptical exercise machine. Lucas also stopped playing outside and would no longer retrieve the mail with his father. As a result, Mr. Waldvogel asked for and received permission to terminate his lease and move away from the Adagio. He eventually moved away from Draper because he feared running into Mr. Porter.

## 2. **Mr. Porter's Animosity Toward African Americans**

As conceded in his brief and as the evidence confirmed, Mr. Porter holds racist views. *See* Porter Opening Br. at 2, 11.

When Mr. Porter moved to the Adagio Apartments in 2016, he asked the leasing agent how many African Americans lived there. After he moved in, Mr. Porter told Adagio maintenance worker Tyler Young, who was working on a vacant apartment above Mr. Porter's apartment, "not to move any niggers in above him." ROA, Vol. V at 130. On another occasion, while fixing Mr. Porter's water heater, Mr. Young overheard Mr. Porter deliver a parody of Dr. Martin Luther King's "I Have a Dream" speech, offering his own dream "that all niggers were dead." *Id.* at 132.

Ms. Adair said that Mr. Porter told her he was "concerned" that the paperboy, who was African American, would break into his apartment. *Id.* at 245. She also stated, "The way [Mr. Porter] spoke about immigration led me to believe that he didn't like Mexicans or South Americans maybe." *Id.* She added, "He didn't like black people." *Id.*

Mr. Porter also demonstrated his racial animus in his comments to Ms. Adair immediately before the assault, to the Draper Police shortly after the assault, and later to the FBI when he was arrested the second time.

7

3. **The FBI's Arrest of Mr. Porter**

Mr. Porter was released after his initial arrest. Shortly thereafter, the Adagio evicted him, and he moved to Arizona. In 2017, nearly a year after the incident, FBI agents arrested Mr. Porter at his new home in Arizona and recorded their interviews with him. In one of these recordings, Mr. Porter recounted his version of the incident and admitted that he had told Lucas, "Get out of here you little stinking nigger." ROA, Vol. III, Exh. 6-3 at 0:38-56.

In another recording, Mr. Porter stated: "I don't want nothing to do with [African Americans]. I even told 'em when I moved in, I said, I don't want to live next to any of 'em. I told 'em at the complex." *Id.*, Exh. 6-5 at 0:33-42. Mr. Porter continued to make anti-African American statements while the FBI agents transported him to a magistrate judge for his arraignment. Special Agent Elliot White reported: "[Mr. Porter] also said that real white men should kill niggers and asked if that was a federal offense. Also, during [sic] multiple times during the transport Mr. Porter said that Hitler had it right, he just had the wrong people, and that he felt that niggers were not even human." ROA, Vol. V at 290 (repeating Mr. Porter's statements that were quoted in the agent's report).

8

4. **Mr. Waldvogel's Family and Race**

Mr. Waldvogel and his two children moved into the Adagio in March 2016.[3] He described his seven-year-old son, Lucas, as "African American" and his daughter as "mixed race." *Id.* at 166.

At trial, witnesses offered varied views about Mr. Waldvogel's race. Ms. Adair identified Lucas as "African American," though she was "not sure of [Mr. Waldvogel's] race or ethnicity, but he didn't look white." *Id.* at 246-47, 251. The Adagio's leasing agent believed Mr. Waldvogel was from "a Latin country" based on Mr. Waldvogel's appearance and conversations they had about food. *Id.* at 123.

Mr. Waldvogel testified, "I have always said my ethnicity is Latin American and my race is mixed." *Id.* at 164. He explained that both his mother and father were Costa Rican, and both were "mixed race." *Id.* at 165. He considered himself "partially African American." *Id.*

Mr. Porter stated in his FBI interviews that Mr. Waldvogel "looked like he was white. He was probably half Negro and then his wife works, and his kids look all a hundred percent, you know." ROA Vol. III, Exh. 6-5 at 0:23-33. Mr. Porter also told the FBI that Mr. Waldvogel "wasn't a Negro, he was a half-Negro." *Id.*, Exh. 6-3 at 1:03-05.

---

[3] Mr. Waldvogel testified that he had a 50-50 custody split with his ex-wife, but "in real life" his children lived with him "90 percent of the time." ROA, Vol. V at 166.

## B. *Procedural History*

### 1. **Indictment and Trial**

A federal grand jury charged Mr. Porter with one count of "Interference with Housing" in violation of 42 U.S.C. § 3631. ROA, Vol. I at 15. The indictment alleged that Mr. Porter

> did by force and threat of force, willfully injure, intimidate, and interfere with, and attempt to injure, intimidate, and interfere with, M.W., an African-American man, because of M.W.'s race and color and because M.W. was occupying a dwelling; specifically, the defendant yelled "nigger," said get out of here to M.W. and M.W.'s seven-year-old-son, and used a stun cane (a Zap Cane) to assault M.W., resulting in bodily injury to M.W. and involving the use of a dangerous weapon . . . .

*Id.* at 15-16.

Mr. Porter pled not guilty. At his three-day jury trial, the Government called nine witnesses and Mr. Porter called one.

### 2. **Rule 29 Motion and Verdict**

At the close of the Government's case, Mr. Porter moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. He challenged the sufficiency of the evidence "as to each and every element of this offense generally, and then specifically and in addition dealing with the element of race, we believe the government has failed to prove that Mr. Porter acted because of the race of Mr. Waldvogel." ROA, Vol. V at 344-45. The district court denied the motion.

10

The jury found Mr. Porter guilty as charged. On its special verdict form, the jury found "[Mr.] Porter used a dangerous weapon," but it did not find "[Mr.] Porter caused bodily injury to [Mr.] Waldvogel." ROA, Vol. I at 128. Mr. Porter did not renew his Rule 29 motion at the end of trial.

### 3. Sentencing

The Presentence Investigation Report ("PSR") calculated a recommended sentencing range of 6-12 months in prison under the Guidelines. The Government objected to the PSR on two grounds. The district court overruled the Government's objections and sentenced Mr. Porter to nine months of imprisonment. We detail the PSR's and the district court's sentencing calculations—and the Government's objections to them—when we address the Government's cross-appeal below.

## II. DISCUSSION

### A. *Mr. Porter's Appeal*

Mr. Porter argues (1) the trial evidence was insufficient to support Mr. Porter's conviction under 42 U.S.C. § 3631, and (2) the district court allowed a constructive amendment to the indictment.

### 1. Sufficiency of the Evidence

Mr. Porter argues the evidence was insufficient because it showed that Mr. Waldvogel "does not appear to be and does not identify as African American." Porter Opening Br. at 18. Accordingly, despite Mr. Porter's demonstrated racial animus towards African Americans, he contends the Government failed to prove he assaulted Mr.

11

Waldvogel on account of Mr. Waldvogel's race. Mr. Porter further argues that even if the jury found Mr. Waldvogel is African American, the evidence still fell short of showing that he acted based on Mr. Waldvogel's race. *See id.* at 18-19; Oral Arg. at 10:28-11:29. We disagree with Mr. Porter.

a. *Standard of review*

In assessing a sufficiency-of-the-evidence challenge, we must consider all the trial evidence, and "[w]e will reverse a conviction for insufficient evidence only when no reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Christy*, 916 F.3d 814, 843 (10th Cir. 2019). We ordinarily review sufficiency challenges de novo, *United States v. Cota-Meza*, 367 F.3d 1218, 1223 (10th Cir. 2004), viewing the evidence and any reasonable inferences drawn therefrom in the light most favorable to the government, *United States v. Poe*, 556 F.3d 1113, 1124 (10th Cir. 2009). We do not weigh the evidence or consider the credibility of witnesses. *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013).

Because Mr. Porter failed to renew his Rule 29 motion at the end of trial, however, our review is for plain error. *See id.* at 1189. To establish plain error, the appellant must demonstrate

> the district court (1) committed error, (2) the error was plain, and (3) the plain error affected her substantial rights. If these factors are met, we may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Story*, 635 F.3d 1241, 1244 (10th Cir. 2011) (citations omitted).

12

Nonetheless, "our review for plain error in this context differs little from our de novo review of a properly preserved sufficiency claim" because "a conviction in the absence of sufficient evidence will almost always satisfy all four plain-error requirements." *United States v. Gallegos*, 784 F.3d 1356, 1359 (10th Cir. 2015) (citing *Rufai*, 732 F.3d at 1189); *see United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008). Accordingly, "review under the plain error standard in this case and a review of sufficiency of the evidence usually amount to largely the same exercise." *United States v. Duran*, 133 F.3d 1324, 1335 n.9 (10th Cir. 1998).

b. *Legal background*

i. 42 U.S.C. § 3631

Congress enacted the Fair Housing Act in 1968. Its "Prevention of Intimidation" provision, codified at 42 U.S.C. § 3631, makes it a crime to use force or the threat of force to injure, intimidate, or interfere with people exercising their Fair Housing Act rights. Mr. Porter was convicted under § 3631, which provides:

> Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—
>
> (a) any person because of his race [or] color . . . and because he is or has been . . . renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling . . . .
>
> shall be fined under Title 18 or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous

13

weapon, . . . shall be fined under Title 18 or imprisoned not more than ten years, or both . . . .

42 U.S.C. § 3631.

Under this statute, the Government must prove that Mr. Porter (1) used force or the threat of force; (2) to willfully injure, intimidate, or interfere with Mr. Waldvogel (or attempt to do so); (3) because of Mr. Waldvogel's race; and (4) because Mr. Waldvogel was occupying a dwelling. *Id.*; *see United States v. Magleby*, 241 F.3d 1306, 1312 (10th Cir. 2001). To prove the conduct amounted to a felony that qualifies for a 10-year maximum sentence, the Government must also show the offense (1) involved the use of a dangerous weapon, or (2) resulted in bodily injury to Mr. Waldvogel. *See* 42 U.S.C. § 3631.

ii. Specific intent: "because of" Mr. Waldvogel's race

Mr. Porter focuses on the third element: that he acted because of Mr. Waldvogel's race. This "specific intent" element turns on the defendant's motivation for his actions. *See Magleby*, 241 F.3d at 1312. To sustain a conviction, "the Government must prove beyond a reasonable doubt that the defendant acted with the specific intent to injure, intimidate or interfere with the victim because of [his] race and because of the victim's occupation of [his] home." *United States v. Whitney*, 229 F.3d 1296, 1303 (10th Cir. 2000) (quotations omitted).

Cases addressing § 3631 have held that this element is satisfied as long as the defendant is motivated, at least in part, by the victim's race and occupation of a dwelling.

14

*Magleby*, 241 F.3d at 1310 (rejecting challenge to jury instruction that stated "it does not matter that the defendant may have had more than one motive in performing the act as long as the defendant's race was one of his motives"). But race and occupation of a dwelling need not be the sole motivation for the defendant's actions. *See id.*; *see also United States v. Piekarsky*, 687 F.3d 134, 144 (3d Cir. 2012) ("[A] 'mixed motive' jury instruction sets forth the correct legal standard for crimes involving a specific intent to deprive a victim of a protected right."); *United States v. Craft*, 484 F.3d 922, 926 (7th Cir. 2007) (stating the government was not required to prove racial animus was the defendant's "sole motivation").

The jury instructions here required the Government to prove "the defendant would not have acted but for the victim's occupancy of his home and the victim's race or color." ROA, Vol. I at 102. To sustain a conviction under § 3631, Mr. Waldvogel's race must have been a necessary motivation but not the sole motivation for Mr. Porter's assault. *See Piekarsky*, 687 F.3d at 144; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989), modified by statute as recognized in *Burrage v. United States*, 571 U.S. 204, 213 n.4 (2014) (interpreting separate statutory provision and concluding "the words 'because of' do not mean 'solely because of'") (plurality op.)); *Wilcox v. Homestake Mining Co.*, 619 F.3d 1165, 1173 (10th Cir. 2010) (explaining in tort context that "there can be multiple but-for causes of a plaintiff's injury"). In *McDonald v. City of Wichita*, the panel reaffirmed this principle, stating, "But for cause does not mean sole cause." 735 F.

15

App'x 529, 531-32 (10th Cir. 2018) (unpublished) (quotations omitted) (cited for persuasive value under 10th Cir. R. 32.1(A)).

Because motivation is difficult to discern, the jury "is permitted to draw inferences of subjective intent from a defendant's objective acts" and statements. *Wingfield v. Massie*, 122 F.3d 1329, 1333 (10th Cir. 1997); *see also Magleby*, 241 F.3d at 1312; *United States v. Johnson*, 971 F.2d 562, 566 (10th Cir. 1992) ("Direct evidence of a defendant's intent is seldom available. Intent can be proven, however, from surrounding circumstances."). "Thus, even when a defendant, as here, denies having the requisite intent, a jury may disbelieve the defendant if [his] words and acts in the light of all the circumstances make [his] explanation seem improbable." *Wingfield*, 122 F.3d at 1333 (quotations omitted).

In *Magleby*, we upheld the defendant's § 3631 conviction against a sufficiency-of-the-evidence challenge. 241 F.3d at 1313. Mr. Magleby had burned a cross on the lawn of an interracial couple. *Id.* He disclaimed knowledge that the couple who lived in the house was interracial, but we held the circumstantial evidence was sufficient to prove he acted out of racial animus. *Id.* We noted that (1) the defendant understood cross-burning symbolized racial hatred, (2) witnesses "clearly recalled [the defendant] indicating the family was black" after he returned from setting fire to the cross, and (3) the husband of the couple was the only African American on the block. *Id.* (alterations and quotations omitted). In addition, the defendant had a history of "racial slurs, racist jokes, racist

16

music, and racist internet sites." *Id.* We concluded this evidence sufficiently established that the defendant acted "because of" the victim's race. *See id.*

Courts have credited a defendant's expression of racial animus before and after the criminal act as probative of intent. In another cross-burning case, for example, the Eighth Circuit upheld the convictions of defendants who had expressed racial animus before burning crosses in neighborhoods where they knew African Americans lived. *United States v. J.H.H.*, 22 F.3d 821, 826-28 (8th Cir. 1994). In *Craft*, the Seventh Circuit upheld the defendant's conviction for setting fire to the homes of Mexican and African American families. 484 F.3d at 924-25. Although the defendant argued his crimes were not racially motivated, his post-arson racist slurs were sufficient to satisfy the specific intent element of § 3631. *Id.* at 926 (quotations omitted).

c. *Analysis*

Based on the trial evidence, a reasonable jury could conclude beyond a reasonable doubt that Mr. Porter assaulted Mr. Waldvogel because of his race. *See* 42 U.S.C. § 3631(a).

Mr. Porter argues he did not act based on race because Mr. Waldvogel did not appear to be African American to him. He points to his arrest interview, when he said Mr. Waldvogel "looked like he was white," ROA, Vol. III, Exh. 6-5 at 0:23-33, and to Mr. Waldvogel's testimony that "I have always said my ethnicity is Latin American and my race is mixed," ROA, Vol. V at 164. Mr. Porter also cites the Adagio leasing agent's testimony that Mr. Waldvogel looked like he was from a "Latin country." *Id.* at 123.

17

And he notes that, although Ms. Adair believed Lucas was "African American," *id.* at 246, she was "not sure" of Mr. Waldvogel's race, *id.* at 251. Mr. Porter therefore contends the evidence was insufficient for the jury to conclude that Mr. Waldvogel looked African American and that Mr. Porter's assaulted him because of his race.

Even if Mr. Porter's theory were plausible, after considering all the evidence, and drawing all reasonable inferences in the Government's favor, we hold a reasonable jury could conclude that Mr. Porter assaulted Mr. Waldvogel because of his race. *See Poe*, 556 F.3d at 1124.

First, the evidence showed Mr. Porter believed Mr. Waldvogel was at least partially African American. Although Mr. Porter stated during his FBI interview that Mr. Waldvogel "looked like he was white," he also said that Mr. Waldvogel was "probably half Negro." ROA, Vol. III, Exh. 6-5 at 0:23-27. This statement comports with Mr. Waldvogel's self-identification as "partially African American," ROA, Vol. V at 165, and with Ms. Adair's testimony that Mr. Waldvogel "didn't look white," *id.* at 251. Based on this evidence, a reasonable jury could have concluded that Mr. Waldvogel was, and Mr. Porter perceived him to be, at least half African American.

Second, Mr. Porter's racial animus toward Lucas combined with his knowledge that Mr. Waldvogel is Lucas's father showed that Mr. Porter acted based on Mr. Waldvogel's race. Although Mr. Porter argues the incident happened too quickly for him to form an opinion about Mr. Waldvogel's race, the evidence suggests otherwise. Mr. Porter admitted that he yelled at Lucas, "Get out of here you little stinking nigger."

18

ROA, Vol. III, Exh. 6-3 at 0:53-55. After that and before the assault, (1) Mr. Waldvogel testified that he told Mr. Porter, "[D]on't yell that stuff at my son;" and (2) Mr. Porter retorted, "[Y]ou and your nigger son can get out of here." ROA, Vol. V at 181. Irrespective of whether he may have thought Mr. Waldvogel was Lucas's biological, adoptive, or step parent, Mr. Porter told the FBI interviewer that Lucas appeared a "hundred percent" African American and his father therefore was "probably half Negro." ROA Vol. III, Exh. 6-5 at 0:23-25. These statements described Mr. Porter's perception of Mr. Waldvogel.

Third, Ms. Adair's interaction with Mr. Porter and her warning to Mr. Waldvogel reflected her perception that Mr. Porter might act based on Mr. Waldvogel's race. Before the assault, Ms. Adair had spoken to Mr. Porter, had heard his racial slurs, and was concerned about the possibility of violence because Mr. Porter had been drinking and because of Mr. Waldvogel's race. She explained: "I am not sure of [Mr. Waldvogel's] race or ethnicity, but he didn't look white, and so I was concerned that that might cause a problem." ROA, Vol. V at 251. She added that, based on how Mr. Porter was acting, she believed he might be violent. *See id.* This evidence was relevant to Mr. Porter's intent because it showed that an eyewitness to the events immediately leading up to the incident recognized the danger that Mr. Porter might act violently toward Mr. Waldvogel based on race.

Fourth, when the Draper Police arrested Mr. Porter, he called them "nigger lovers." *Id.* at 193. Because this statement came shortly after Mr. Porter assaulted Mr.

19

Waldvogel with a stun cane, a reasonable jury could infer that Mr. Porter perceived Mr. Waldvogel as an African American and acted on that perception.

Finally, as noted above, cases addressing § 3631 establish that we may consider Mr. Porter's racial animus as corroborating his intent to act. *See Magleby*, 241 F.3d at 1313; *Craft*, 484 F.3d at 926. Before the incident, Mr. Porter told workers at the Adagio that he did not want any African Americans living near him. ROA, Vol. V at 130; ROA, Vol. III, Exh. 6-5 at 0:35-40. Based on her interactions with Mr. Porter, Ms. Adair testified that "[h]e didn't like black people." ROA, Vol. V at 245. During his arrest, Mr. Porter declared that "real white men should kill niggers" and that "he felt that niggers were not even human." *Id.* at 290. This evidence of Mr. Porter's racist views lends support to the jury's finding that he acted with racial motives. *See Magleby*, 241 F.3d at 1313; *Craft*, 484 F.3d at 926 (holding that evidence of defendant's racial animus supported a finding that he acted with racial motives).

*       *       *       *

Mr. Porter expressed anti-African American sentiments from the time he moved into the Adagio until moments before he assaulted Mr. Waldvogel. Among other things, he stated that he did not want African Americans living near him. The evidence permitted a jury to conclude Mr. Waldvogel is partially African American, Lucas is fully African American, and Mr. Porter knew Mr. Waldvogel was Lucas's father. Mr. Porter's racist statement, "you and your nigger son can get out of here," made just seconds before he assaulted Mr. Waldvogel, linked Mr. Porter's racial animus to his actions. ROA, Vol.

20

V at 181. A year later, Mr. Porter reaffirmed his racist beliefs in taped interviews with the FBI. The evidence showed that Mr. Waldvogel's having an African American son was one of Mr. Porter's motivations for the assault, but the evidence also was sufficient for a reasonable jury to find that Mr. Porter assaulted Mr. Waldvogel "because of" Mr. Waldvogel's race. 42 U.S.C. § 3631; *see Magleby*, 241 F.3d at 1310, 1313 (affirming mixed-motivation jury instruction and rejecting sufficiency-of-the-evidence challenge).

## 2. **Constructive Amendment**

Mr. Porter next argues the trial evidence, jury instructions, and the prosecution's opening statements and closing arguments likely induced the jury to convict Mr. Porter for his treatment of seven-year-old Lucas rather than for his assault of Mr. Waldvogel. He thus argues the district court improperly allowed the Government to constructively amend the indictment. We disagree.

### a. *Additional procedural background*

Mr. Porter does not challenge the jury instructions. Instruction No. 15 listed the elements of the crime:

| | |
|---|---|
| First: | The defendant used force or threat of force; |
| Second: | The defendant willfully injured, intimidated or interfered with M.W., or willfully attempted to injure, intimidate or interfere with M.W.; |
| Third: | The defendant acted because M.W. was occupying a dwelling and because of M.W.'s race or color; and |

21

Fourth: The defendant's conduct resulted in bodily injury to M.W. or involved the use, attempted use, or threatened use of a dangerous weapon.

ROA, Vol. I at 144.[4]  In reading this instruction to the jury, the district court clarified,

"I'm sure you understand that M.W. refers to Mike Waldvogel."  ROA, Vol. V at 376.

Near the beginning of its opening statement, the Government highlighted:

> Ladies and gentlemen, it is not against the law to hate black people.  The judge will tell you that it is not a crime to use racial slurs.  *It is not even illegal to shout them at small children, but this defendant has been charged with using force to willfully intimidate and interfere and injure Mike Waldvogel because Mike Waldvogel was black and because Mike Waldvogel was occupying a home.*  After you all have heard this evidence, we're going to come back and we're going to ask you to hold this defendant accountable for what he did that day and we're going to ask you to find him guilty.

ROA, Vol. V at 82 (emphasis added).

In closing argument, the prosecutor commented on how the assault affected Lucas Waldvogel:  "You have heard over the course of three days that the defendant attacked a seven-year-old African American boy using words.  Fervently and loudly he attacked that African American boy because he was riding his scooter around the courtyard of his

---

[4] The indictment charged Mr. Porter with using a dangerous weapon *and* with causing bodily harm to Mr. Waldvogel.  ROA Vol. I at 16.  Both the statute and the jury instructions state that Mr. Porter would be guilty if the jury found he used a dangerous weapon *or* caused bodily injury.  *Id.* at 144; 42 U.S.C. § 3631.  This difference between the conjunctions "and" and "or" is of no moment here.  *See United States v. Gunter*, 546 F.2d 861, 868-69 (10th Cir. 1976) ("It is hornbook law that a crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive.").

22

home."  *Id.* at 380.  The Government referenced Lucas Waldvogel at other points in its opening statement and closing arguments.

b.  *Standard of review*

Mr. Porter did not present a "constructive amendment" argument to the district court.  Accordingly, we review this issue under the plain error standard previously described.  *See United States v. Miller*, 891 F.3d 1220, 1231 (10th Cir. 2018) (reviewing for plain error a constructive amendment argument not raised before district court); Porter Opening Br. at 19 (acknowledging that his constructive amendment argument was "unpreserved").  Mr. Porter has not established error on this ground.

c.  *Legal background*

"[I]t is a fundamental precept of federal constitutional law that a court cannot permit a defendant to be tried on charges that are not made in the indictment."  *Hunter v. New Mexico*, 916 F.2d 595, 598 (10th Cir. 1990) (quotations omitted).  "A court constructively amends the indictment if the evidence presented at trial and the instructions raise the possibility that a defendant may have been convicted on a charge other than that alleged in the Indictment."  *United States v. Kalu*, 791 F.3d 1194, 1206 (10th Cir. 2015) (quotations omitted); *see United States v. Edwards*, 782 F.3d 554, 561 (10th Cir. 2015) (holding that a constructive amendment occurs when the evidence and jury instructions create "a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment").  The prohibition on constructive amendments protects against the dangers that:  "(1) the defendant must

23

answer a charge that had not been brought by a grand jury, and (2) the defendant is denied sufficient notice to present and prepare an adequate defense." *Kalu*, 791 F.3d at 1206.

In assessing whether the district court improperly allowed a constructive amendment, "[t]he jury instructions are of particular importance" because they provide "assurance" that the jury found "the conduct charged in the indictment before it [could] convict." *Miller*, 891 F.3d at 1232. In *Miller*, the indictment charged the defendant with a specific false statement regarding a previous suspension of his state medical license on a DEA registration application. *Id.* at 1232. The jury instructions, however, allowed for a conviction based on a second, uncharged false statement regarding a surrender or suspension of his federal controlled-substance registration. *Id.* at 1232-33. We held that a constructive amendment had occurred, explaining:

> The indictment . . . directly tied the false-statement charge to Defendant's suspended Colorado license, and the prosecutor's argument that the jury could convict him based instead on the surrender of his federal controlled-substance registration reveals the very real possibility that Defendant was convicted on a different set of facts than those alleged in the indictment.

*Id.* at 1233; *see United States v. Farr*, 536 F.3d 1174, 1184 (10th Cir. 2008) (finding a constructive amendment and reversing defendant's tax evasion conviction when "the evidence and jury instructions at trial introduced to the jury an alternative way in which the crime could have occurred" through "a different tax evaded").

    d. *Analysis*

24

Mr. Porter does not challenge the jury instructions, the admission of any of the Government's evidence, or the Government's opening statement or closing arguments. Instead, he argues the district court allowed the jury to substitute Lucas Waldvogel as the victim. Neither the record nor this court's case law supports his argument.

We presume the jury followed the court's instructions "absent evidence to the contrary." *Christy*, 916 F.3d at 841. References in the instructions using Mr. Waldvogel's initials, M.W., and labelling him as "the victim" could not reasonably be construed as referring to Lucas. Instruction No. 15 properly recited the elements of 42 U.S.C. § 3631, listed "M.W." as the victim, and told the jury it needed to find that "the defendant acted because M.W. was occupying a dwelling and because of M.W.'s race or color." ROA, Vol. I at 144. Instruction No. 15 also explained that the jury needed to find that the "defendant's conduct resulted in bodily injury to M.W. or involved the use, attempted use, or threatened use of a dangerous weapon." *Id.* Instruction No. 17 used Mike Waldvogel's full name and demanded that the jury's verdict be unanimous. Neither Lucas Waldvogel's name nor his initials appear anywhere in the instructions. We see no basis for concern that the jury could have been confused about the identity of the alleged victim.

In addition, the Government presented no evidence that Mr. Porter's conduct toward Lucas "resulted in bodily injury" to the boy or "involved the use, attempted use, or threatened use of a dangerous weapon." *Id.* Instead, the evidence showed that Mr. Porter kept the stun cane by his leg as Mr. Waldvogel approached. Mr. Waldvogel

25

testified that he never got a good look at the cane until he yanked it from Mr. Porter's hands. Ms. Adair testified that, during this encounter, "Lucas was far off on kind of the other side of the grassy area." ROA, Vol. V at 251.

Further, the Government's evidence showed Mr. Waldvogel was the victim. For example, (1) Ms. Adair and Mr. Waldvogel both testified about Mr. Porter's assault of Mr. Waldvogel with the stun cane; (2) the jury heard Mr. Waldvogel's 911 call, in which he reported that Mr. Porter had struck him with the stun cane; and (3) the Government introduced the broken stun cane and a brand-new identical (and functional) stun cane at trial. Although there was some testimony about Lucas's reaction to the incident, the trial evidence focused on Mr. Porter's stun cane and his altercation with Mr. Waldvogel.

Because the evidence focused on Mr. Porter's assault and there was no suggestion that Mr. Porter used or threatened to use a dangerous weapon against Lucas Waldvogel, or physically threatened or harmed him in any way, there was no reasonable likelihood the jury could have found that Lucas was the victim rather than his father. The jury instructions and the evidence eliminate "the possibility that [Mr. Porter] may have been convicted on a charge other than that alleged in the Indictment." *Kalu*, 791 F.3d at 1206.

Finally, in addition to the jury instructions and the trial evidence, the prosecution's opening statement emphasized that Mr. Waldvogel was the victim: "The judge will tell you that it is not a crime to use racial slurs. It is not even illegal to shout them at small children." ROA, Vol. V. at 82. In other words, the Government cautioned the jury that it could not convict Mr. Porter for his words to Lucas. In its closing argument, the

26

Government reinforced that Mr. Waldvogel was the victim of Mr. Porter's assault, noting Mr. Porter was charged with "a hate crime and for having willfully used force to injure, intimidate and interfere with Mike Waldvogel because Mike Waldvogel was occupying a dwelling and because of Mike Waldvogel's race." *Id.* at 380.

We reject Mr. Porter's constructive amendment argument. It repackages his sufficiency-of-the-evidence argument. He asserts the Government could not prove Mr. Waldvogel was African American and posits that the jury may have convicted Mr. Porter of verbally assaulting Lucas because of Lucas's race. That argument fails because neither the jury instructions, the trial evidence, nor the prosecution's opening statement and closing arguments created a plausible risk that the jury substituted Lucas for Mr. Waldvogel as the victim of Mr. Porter's assault.

## B. *The Government's Cross-Appeal*

The Government challenges the procedural reasonableness of Mr. Porter's sentence. After setting forth the applicable legal background, we identify the relevant Sentencing Guidelines, detail the district court's sentencing proceedings, and analyze the merits of the Government's arguments.

### 1. **Legal Background**

#### a. *Procedural reasonableness*

"We review the overall reasonableness of a sentence in two steps," for procedural and substantive reasonableness. *United States v. Gieswein*, 887 F.3d 1054, 1058 (10th

Cir. 2018); *see Gall v. United States*, 552 U.S. 38, 51 (2007). Only procedural

reasonableness is at issue in this appeal.

Procedural error includes "failing to calculate (or improperly calculating) the

Guidelines range, treating the Guidelines as mandatory, failing to consider the

[18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or

failing to adequately explain the chosen sentence—including an explanation for any

deviation from the Guidelines range." *Gall*, 552 U.S. at 51; *see United States v. Sanchez-Leon*, 764 F.3d 1248, 1261-62 (10th Cir. 2014).

b. *Standard of review*

We review procedural reasonableness for abuse of discretion, which means "we

review de novo the district court's legal conclusions regarding the guidelines and review

its factual findings for clear error." *United States v. Gantt*, 679 F.3d 1240, 1246 (10th

Cir. 2012); *see Gall*, 552 U.S. at 56.

Under clear error review, we "view the evidence and inferences drawn therefrom

in the light most favorable to the district court's determination." *United States v. Brown*,

314 F.3d 1216, 1222 (10th Cir. 2003). "To constitute clear error, we must be convinced

that the sentencing court's finding is simply not plausible or permissible in light of the

entire record on appeal, remembering that we are not free to substitute our judgment for

that of the district judge." *United States v. McClatchey*, 316 F.3d 1122, 1128 (10th Cir.

2003) (quotations omitted); *see Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74

(1985) ("[I]f the district court's account of the evidence is plausible in light of the record

28

viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). If the district court's factual determination depends on its assessment of a witness's credibility, its conclusion is "virtually unreviewable on appeal." *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003) (quotations omitted).

      c. *Harmless error*

The party challenging the sentence—here, the Government—"bears the initial burden of showing that the district court" erred. *Williams v. United States*, 503 U.S. 193, 203 (1992). If we find a procedural error, "resentencing is required only if the error was not harmless." *United States v. Cerno*, 529 F.3d 926, 939 (10th Cir. 2008); *see* 18 U.S.C. § 3742(f)(1) (requiring remand for resentencing when a sentence "was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines"). "Harmlessness must be proven by a preponderance of the evidence, and the burden of making this showing falls on the beneficiary of the error"—here, Mr. Porter. *Cerno*, 529 F.3d at 939.

The Supreme Court has said: "When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016). Thus, when a district court has applied the wrong Guidelines range, appellate courts generally presume the error requires reversal and

29

remand for resentencing. *See id.*; *see also United States v. Kieffer*, 681 F.3d 1143, 1169 (10th Cir. 2012) (noting that "we are compelled to remand for resentencing when we find" that the district court calculated the Guidelines range incorrectly (quotations omitted)).

The Tenth Circuit has recognized a limited exception to this reverse-and-remand rule: "We deem procedural error not reversible, *i.e.*, harmless, if the record viewed as a whole clearly indicates the district court would have imposed the same sentence had it not relied on the procedural miscue(s)." *Kieffer*, 681 F.3d at 1165. In *Gieswein*, for example, the district court varied upward from the Guidelines sentence to the statutory maximum of 240 months based on the defendant's criminal history. 887 F.3d at 1056. We reversed the defendant's first sentence based on intervening Supreme Court law. On remand, the district court again issued a 240-month sentence, indicating it would go higher if it could. *Id.* Under these circumstances, we held on the second appeal that an erroneous miscalculation of the applicable Guidelines range at the defendant's resentencing was harmless. *Id.*

We noted in *Gieswein*, however, that it constituted the "rare case." *Id.* It is not enough for the district court to say "that its conclusion would be the same even if all the defendant's objections to the presentence report had been successful." *Id.* at 1062 (quotations omitted); *see also United States v. Pena-Hermosillo*, 522 F.3d 1108, 1117-18 (10th Cir. 2008). In short, we will find the district court's error was harmless only when

30

it is clear from the record that the court would have imposed the same sentence regardless of the correct Guidelines calculation. *Gieswein*, 887 F.3d at 1063.

d. *The relevant Guidelines provisions*

Section 2H1.1 is the Guideline for convictions under 42 U.S.C. § 3631. It provides that courts should apply the "greatest" base offense level of the following:

> (1) the offense level from the offense guideline applicable to any underlying offense;
>
> (2) 12, if the offense involved two or more participants;
>
> (3) 10, if the offense involved (A) the use or threat of force against a person; or (B) property damage or the threat of property damage; or
>
> (4) 6, otherwise.

U.S.S.G. § 2H1.1(a).

For the purposes of this case, there are two possible "underlying offenses" that could apply under U.S.S.G. § 2H1.1(a)(1): assault or aggravated assault. For "assault" the base offense level is "7, if the offense involved physical contact, or if a dangerous weapon (including a firearm) was possessed and its use was threatened." U.S.S.G. § 2A2.3(a)(1). For aggravated assault, the base offense level is 14. U.S.S.G. § 2A2.2(a). The § 2A2.2 aggravated assault comments explain: "'Aggravated assault' means a felonious assault that involved (A) *a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon*; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another

31

felony." U.S.S.G. § 2A2.2 cmt. n.1 (emphasis added); *see United States v. McConnell*, 605 F.3d 822, 824 (10th Cir. 2010) ("Commentary to the Guidelines is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." (quotations omitted)).

2. **Additional Procedural Background**

The PSR calculated Mr. Porter's recommended sentence under § 2H1.1, using assault as the "underlying offense."[5] It found his base offense level was seven under the assault Guideline, U.S.S.G. § 2A2.3(a)(1), and applied a three-level "hate crime" upward adjustment under U.S.S.G. § 3A1.1(a) because Mr. Porter "intentionally selected any victim . . . because of the actual or perceived race, color, . . . ethnicity, . . . or sexual orientation of any person." With an adjusted offense level of 10 and a criminal history category of I, the recommended Guidelines range was 6 to 12 months of imprisonment.

The Government objected to the PSR. It argued the "underlying offense" for Mr. Porter's offense was aggravated assault under U.S.S.G. § 2A2.2 because Mr. Porter "used a dangerous weapon with the intent to cause bodily injury." ROA, Vol. I at 154-55 (quoting the Guidelines). The Government argued that, under this Guideline, the district court should have (1) begun with a base offense level of 14, (2) added three levels under

---

[5] As noted above, because the jury found Mr. Porter "used a dangerous weapon" to violate § 3631, he qualified for a maximum sentence of 10 years. ROA Vol. I at 128; *see* 42 U.S.C. § 3631. The jury did not find that "Mark Porter caused bodily injury to Mike Waldvogel." ROA, Vol. I at 128.

the "hate crime" enhancement, and (3) added four levels for Mr. Porter's use of a dangerous weapon under U.S.S.G. § 2A2.2(b)(2)(B). Gov't Opening Br. at 10-11. With a criminal history category of I, the Government's calculations would have yielded a total offense level of 21 and an advisory Guidelines range of 37 to 46 months. *Id.* at 11.

The Government argued alternatively that even if assault was the proper "underlying offense," the base level should be 10 under § 2H1.1(a)(3), not seven. After adding the three-level hate crime enhancement for a total offense level of 13, the advisory Guideline range would have been 12 to 18 months. *See* Gov't Opening Br. at 11.

The district court overruled the Government's objections and found that "the guidelines [were] correctly calculated in the [PSR]." ROA, Vol. V at 449. As noted above, the judge sentenced Mr. Porter to nine months, adding, "I would reach the same sentence under the 3553 factors." *Id.* at 450. The court reasoned,

> I am not trying to do a lenient sentence here. I am trying to do a sentence that I think is appropriate and reasonable under all of the circumstances. This was an altercation between two men. There is a federal statute that makes it clearly against the law to act on the basis of race. This happened the way it happened and we have the record and the jury found him guilty and he should serve a period of time incarcerated. Sometimes we forget how long nine months is in jail. He has served that. He will be on one year of supervised release following his release from custody, during which time he will be required to comply with all the standard conditions of supervised release.

*Id.* at 451-52.

33

3. **Analysis**

On appeal, the Government argues the district court erred by failing to use aggravated assault as the "underlying offense" when calculating Mr. Porter's Guidelines range. It contends in the alternative that the court erred in applying a base offense level of seven rather than 10 under U.S.S.G. § 2H1.1 because the offense involved "the use or threat of force against a person." We conclude the Government's alternative calculation is the correct one and reverse and remand for resentencing on that basis.

a. *Aggravated assault as the underlying offense and proof of intent to injure*

The jury concluded in its special verdict that Mr. Porter "used a dangerous weapon." ROA, Vol. I at 128; *see* U.S.S.G. § 2A2.2 cmt. n.1. Whether the district court should have used aggravated assault as the "underlying offense" under § 2H1.1(a) therefore turns on Mr. Porter's "intent to cause bodily injury (i.e., not merely to frighten) with that weapon," a question of fact. U.S.S.G. § 2A2.2 cmt. n.1. By sentencing Mr. Porter under the assault provision, the district court necessarily found that Mr. Porter did not have the requisite intent.

We review this finding for clear error. *United States v. Ford*, 613 F.3d 1263, 1270 (10th Cir. 2010) (reviewing district court's determination of defendant's intent for clear error). Under de novo review, we may have viewed Mr. Porter's intent during his encounter with Mr. Waldvogel differently from the district court's view. We conclude, however, the court's implicit finding that Mr. Porter lacked intent to injure Mr.

34

Waldvogel was not clearly erroneous.  *See Brown*, 314 F.3d at 1221 (construing evidence in the light most favorable to the district court's determination).

i.  The Government's reliance on the special verdict

The Government argues Mr. Porter necessarily intended to cause bodily injury because the jury's special verdict found that he "used a dangerous weapon."  ROA, Vol. I at 128.  It reasons that Mr. Porter's activating the stun cane and striking Mr. Waldvogel on the neck conclusively established Mr. Porter's intent to injure.

The jury instructions, which paraphrased the statute, undercut this argument.  The instructions stated that, to prove a violation of § 3631, the Government needed to show that Mr. Porter by force or threat of force "willfully injured, intimidated or interfered with M.W., or willfully attempted to injure, intimidate or interfere with M.W." because of his race and because he was occupying a dwelling.  ROA, Vol. I at 144; *see* 42 U.S.C. § 3631.  For a § 3631 offense to constitute the charged felony, the instructions further stated the Government needed to prove that Mr. Porter's "conduct resulted in bodily injury to M.W. or involved the use, attempted use, or threatened use of a dangerous weapon."  ROA, Vol. I at 144; *see* 42 U.S.C. § 3631.

Under the statute and the court's instructions, the jury could have found only that Mr. Porter interfered with, intimidated, or attempted to interfere with or intimidate Mr. Waldvogel.  None of these possible findings require proof that Mr. Porter intended to cause bodily injury, yet all are consistent with the jury's special finding that Mr. Porter "used a dangerous weapon."  ROA, Vol. I at 128.  They are also consistent with the

35

jury's special finding that Mr. Porter did not "cause[] bodily injury to Mr. Waldvogel."
*Id.* The special verdict form did not ask the jury to determine whether Mr. Porter used "a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon," as required to apply the aggravated assault Guideline. U.S.S.G. § 2A2.2, cmt. n.1. Accordingly, the jury did not determine whether he intended to cause bodily injury.

### ii. The district court's determination

It therefore fell to the district court at sentencing to decide whether the Government had shown by a preponderance of the evidence that Mr. Porter intended to cause bodily injury. *See United States v. O'Brien*, 560 U.S. 218, 224 (2010) ("Sentencing factors . . . can be proved to a judge at sentencing by a preponderance of the evidence."). By choosing assault as the § 2H1.1(a) "underlying offense" over the Government's objection, the court necessarily found intent lacking.

The divergent testimony at trial was consistent with that determination. Ms. Adair testified that she heard the stun cane but did not see Mr. Porter strike Mr. Waldvogel. Even Mr. Waldvogel failed to offer testimony that Mr. Porter intentionally hit him. He stated, "[T]he next thing I remember was hearing the arcing of a device as it came over this side of my head and then it hit me on my neck." ROA, Vol. V at 182. He did not say he saw Mr. Porter swing the cane at him, nor did he claim that Mr. Porter intended to

36

strike him. *See id.*[6] Mr. Porter told the FBI, "I didn't zap him," and said that Mr. Waldvogel had walked into the cane as he was holding it in front of him. ROA, Vol. III, Exh. 6-3 at 1:15-22. Mr. Porter also stated that Mr. Waldvogel approached him and caused him to think, "[W]hy is he not backing off?" before Mr. Waldvogel pulled the cane away and walked off with it. *Id.* at 1:25-32. The evidence is consistent with Mr. Porter's intending to intimidate or frighten Mr. Waldvogel rather than injure him. *See Virgen-Chavarin*, 350 F.3d at 1134 (deferring to district court's credibility determination).

In sum, § 3631 allows a sentence exceeding one year because, as the jury specifically found here, Mr. Porter assaulted Mr. Waldvogel with a dangerous weapon. Because Mr. Porter used a stun cane to assault Mr. Waldvogel and pictures suggest the cane left a red mark on his neck, it may have been reasonable to conclude that Mr. Porter intended to cause bodily injury. But the district court found that, under the Guidelines, the underlying offense was an assault and not an aggravated assault because the jury did not find Mr. Waldvogel suffered a serious injury and because the evidence did not show Mr. Porter intended to cause bodily injury. Whether or not we agree with the court's finding, we cannot say it was clearly erroneous. *Anderson*, 470 U.S. at 574 ("[T]he court of appeals may not reverse [the district court] even though convinced that had it been

---

[6] A picture of the red mark on the back of Mr. Waldvogel's neck suggests he might not have been facing Mr. Porter when he felt the device strike him. *See* ROA, Vol. II, Exh. 4-2.

sitting as the trier of fact, it would have weighed the evidence differently."). The district court therefore did not abuse its discretion by declining to use aggravated assault to calculate Mr. Porter's advisory Guidelines range.[7]

   b. *Proper application of U.S.S.G. § 2H1.1 and "the use or threat of force"*

The Government fares better with its second sentencing argument. The district court found that assault was the "underlying offense" and applied a base offense level of seven under §§ 2H1.1(a)(1) and 2A2.3(a)(1). The problem with this calculation is, "[p]ursuant to § 2H1.1, the court must take the most severe base offense level," *United States v. Serrata*, 425 F.3d 886, 908 (10th Cir. 2005), and § 2H1.1(a)(3) requires a base offense level of 10 "if the offense involved . . . the use or threat of force against a person."

By definition, Mr. Porter's § 3631 felony conviction involved "force or [the] threat of force." 42 U.S.C. § 3631. Mr. Porter's conviction under § 3631 plainly qualified for a base offense level of 10, which is, of course, greater than the base level of seven that the district court applied using assault as the "underlying offense." *See* U.S.S.G. § 2H1.1(a)(3). In other words, the district court incorrectly applied § 2H1.1(a)(1) rather than § 2H1.1(a)(3).

---

[7] The clear error standard of review determines our holding. If, based on the same evidence, the district court (1) found that Mr. Porter intended to injure Mr. Waldvogel and (2) used aggravated assault as the "underlying offense" to calculate the Guidelines range under § 2H1.1, and if Mr. Porter—rather than the Government—challenged the Guidelines calculation, we would affirm for the same reason we affirm here: The court's factual finding would not have been clearly erroneous.

The parties appear to agree that this was an error.  *See* Porter Resp. Br. at 33 (arguing only for harmless error); *see also* Gov't Resp. Br. at 10 ("[Mr.] Porter appears to concede that, even if aggravated assault does not apply, the district court committed clear procedural error by failing to apply a base offense level of 10.").  The remaining question is whether the district court's erroneous calculation was harmless.  It was not.

The district court should have begun with a base offense level of 10, added three levels under U.S.S.G. § 3A1.1(a) for selecting a victim based on race, and applied a criminal history category of I to produce a Guideline range of 12 to 18 months.  To reach a nine-month sentence, the district court would have needed to vary downward from the advisory Guideline range.  The record contains no evidence it would have done so.  Indeed, the court declared it was "not trying to do a lenient sentence here."  ROA, Vol. V at 451.  Even if the record were ambiguous as to whether the district court would have imposed the same sentence under a 12-to-18-month Guidelines range, our precedent requires us to remand.  *See Gieswein*, 887 F.3d at 1056.

In sentencing Mr. Porter to nine months, the district court explained it was not being "lenient" and noted that Mr. Porter's offense was not as bad as some of the other § 3631 cases because it "involved an altercation between two men."  ROA, Vol. V at 451.  The court said that "sometimes we forget how long nine months is in jail," and it emphasized Mr. Porter's one year of supervised release.  *Id.* at 452.  It further stated that it "would reach the same sentence under the 3553 factors."  *Id.* at 450.

39

Under our case law, however, simply citing the § 3553 factors does not insulate the sentence from procedural error. *See Pena-Hermosillo*, 522 F.3d at 1117. Instead, the record must show that the corrected Guideline range would not have affected the sentence. *See Gieswein*, 887 F.3d at 1063. In *Gieswein*, a "rare case," the district court varied upward from the Guidelines range twice, both times reaching the statutory maximum. *Id.* It stopped at the 240-month maximum only because the statute would not allow a harsher sentence. *Id.* Nothing comparable happened in this case. The court sentenced Mr. Porter in the exact middle of his range.

Mr. Porter advances one remaining argument. He suggests our harmlessness analysis is not the same when the court's error favors the defendant rather than the Government. *See* Porter Resp. Br. at 35 n.8. But he cites no authority. To the contrary, 18 U.S.C. § 3742 permits both defendants and the Government to appeal a sentence that "was imposed as a result of an incorrect application of the sentencing guidelines." 18 U.S.C. § 3742(a)(2) (appeal by a defendant); *id.* § 3742(b)(2) (appeal by the Government). In addition, § 3742(f) states that, if "the sentence was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings." In sum, Mr. Porter has not shown and cannot show the district court's error was harmless.

## III. **CONCLUSION**

We reject Mr. Porter's sufficiency of the evidence and constructive amendment challenges and affirm his conviction. We reject the Government's argument that the district court erred by failing to use the "underlying offense" of aggravated assault to determine Mr. Porter's base offense level. But we agree with the Government that the district court incorrectly determined Mr. Porter's base offense level under U.S.S.G. § 2H1.1(a). Because that error was not harmless, we remand with instructions for the district court to vacate the original sentence and to resentence Mr. Porter in accordance with this opinion.